**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **MICHELLE KAISER, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **vs.** | ) | **Case No.  08-CV-586-TCK-FHM** |
| | ) | |
| **AT THE BEACH, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

### Table of Contents

**Findings of Fact**

I.    § 213(a)(1) Exemptions
    A.    Before August 15, 2008
    B.    August 15, 2008-December 1, 2008
    C.    After December 1, 2008
II.   Hours Worked
III.  Statute of Limitations/Liquidated Damages
IV.   Beaucourt's Testimony
V.    Damages

**Conclusions of Law**

I.    § 213(a)(1) Exemptions
    A.    Before August 15, 2008
    B.    August 15, 2008-December 1, 2008
    C.    After December 1, 2008
        1.    Salary Level Test
        2.    Salary Basis Test
        3.    Duties Test
            a.    Primary Duty of Management
            b.    Directed Work of 2 or More Employees and Authority to Hire/Fire
II.   Hours Worked
    A.    Reasonableness of Plaintiffs' Estimates
    B.    Prospecting
III.  Statute of Limitations/Liquidated Damages
IV.   Beaucourt's Testimony
V.    Damages
    A.    General Law and Regulations
    B.    Rejection of FWW Method
    C.    Court's Formula for Regular Rate
        1.    Total Renumeration
        2.    Divisor
    D.    Court's Formula for Back Due Wages
VI.   Non-Testifying Plaintiffs
VII.  § 207(i) Exemption
VIII. Calculations

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

On November 24, 2009, the Court certified the above-styled case as a collective action under the Fair Labor Standards Act ("FLSA").[1]  This collective action, which includes twenty-six Plaintiffs, was tried to the Court without a jury on March 21-25, 2011.  As ordered by the Court, the parties submitted proposed findings of fact and conclusions of law with citations to the trial record.  (*See* Docs. 189, 190.)  The Court enters the following Findings of Fact and Conclusions of Law in accordance with Federal Rule of Civil Procedure 52.[2]

### Findings of Fact

1.      Defendant At The Beach, Inc. ("ATBI") owns and operates tanning stores in several states.  Customers purchase tanning packages and tan in the store.  Each store has tanning products for sale, such as tanning lotion.

2.      ATBI hires employees to manage its individual stores.  All Plaintiffs were employed by ATBI as store managers and/or assistant store managers in Oklahoma, Kansas, Colorado, and/or Arizona.  ATBI store managers are supervised by district managers, and district managers are supervised by regional managers.

3.      Barbara Young started ATBI as a family-owned business consisting of two stores in Oklahoma City, Oklahoma.  Young's children, Hoyl Belt ("Belt") and Candi Chappell ("Chappell"), were employed by ATBI at relevant times.

---

[1]  On December 9, 2010, the Court entered an Opinion and Order ("Order") addressing, *inter alia*, ATBI's motion to decertify the collective action and the parties' cross motions for partial summary adjudication.  *See Kaiser v. At the Beach, Inc.*, No. 08-CV-586, 2010 WL 5114729 (N.D. Okla. Dec. 9, 2010).  The Order reaches several relevant conclusions of law and is incorporated herein by reference.

[2]  Any Findings of Fact that are Conclusions of Law shall be construed accordingly, and any Conclusions of Law that are Findings of Fact shall be construed accordingly.

4.      In 2004, ATBI had 19 stores.  From 2006 - 2008, the approximate time period of the alleged

FLSA violations, ATBI grew from 20 stores to 40 stores.  At the time of trial, ATBI owned 58

stores, had over 400 employees, and had a large corporate headquarters in Denver, Colorado.

5.      At certain relevant times, ATBI's employee handbook provided:

> Nonexempt – All nonexempt employees are paid on an hourly basis and are expected
> to confine their work to the normal workday and workweek unless their manager
> authorizes overtime in advance.  Hourly paid employees will be paid overtime for
> all authorized hours worked in excess of 40 hours within a workweek.  Workweek
> is defined as opening of business Monday through close of business Sunday.

> Exempt – All exempt employees are paid on a *biweekly salary basis*.  Hours worked
> by salaried employees are often irregular and begin and end beyond the normal
> workday.  Salaried employees are exempt from the overtime provisions of the
> Federal Wage and Hour Law and do not receive overtime pay.

(*See* Pls.' Ex. 43 at 31 (emphasis added).)  Prior to August 15, 2008, all store managers and assistant

store managers were paid a fixed salary[3] and therefore fell into the "exempt" category, as defined

in the ATBI handbook.

6.      According to Cindy Stuart ("Stuart"), ATBI's office manager and payroll supervisor, the

handbook was created by Belt.  Belt did not testify at trial, and ATBI provided no explanation for

its initial decision to pay managers and assistant managers on a salary basis rather than an hourly

basis.

7.      On or around July 2008, the United States Wage and Hour Division of the Department of

Labor ("DOL") conducted an investigation of ATBI ("2008 DOL Investigation").  Following such

investigation, DOL investigator Barbara Sullivan ("Sullivan") cited ATBI for "failure to pay non-

exempt salaried managers overtime wages."  (Def.'s Ex. 1.)  Sullivan determined that ATBI owed

---

[3]  Plaintiffs were actually paid semimonthly, *i.e.*, on the 1st and 15th of the month, rather
than biweekly, *i.e.*, every two weeks.

back wages to 301 employees in unpaid overtime in the total amount of $68,197.08.  On November 3, 2008, Stuart signed a document entitled Summary of Unpaid Wages ("DOL Summary"), agreeing to pay the 301 listed employees the amounts calculated by Sullivan for unpaid overtime.

8.      The DOL Summary contains a "Gross Amounts Due" column.  Sullivan calculated gross amounts due based on a 48-hour workweek – or eight hours of overtime – for every relevant employee.  As to the gross amount due, Sullivan stated: "The gross amounts of back wages due to each manager were calculated as follows: Bi-weekly wages x .83[4] = amount due per employee.  The hourly rate = salary + bonuses + commissions/48."  (*See* Def.'s Ex. 1 (footnote in original) (alteration to footnote added).)  Thus, Sullivan used her finding of Plaintiffs' average total weekly hours (48) as the divisor in determining their regular hourly rate of pay.  In determining the overtime owed, she used the DOL's Coefficient Table for Computing Extra Half-time for Overtime, DOL Form WH-135, which provides a .83 rate for 48 hours of overtime.  As explained in the Court's Conclusions of Law, Sullivan's calculations therefore assumed Plaintiffs had been paid "straight-time" rates for all 48 hours worked, such that only an additional "half time" was owed for the 8 unpaid overtime hours.

9.      Stuart sent checks for back due wages through July 7, 2008 in the amounts set forth in the DOL Summary.  Plaintiffs did not accept such checks and proceeded with this litigation.  *See Kaiser*, 2010 WL 5114729, at * 9-11 (ruling on parties' cross motions for summary judgment on issue of waiver).

10.     At all times prior to August 15, 2008, ATBI did not keep contemporaneous time records or consistently require Plaintiffs to clock in or clock out.

---

[4] Based on Coefficient Table for Comparing [sic] Extra Half-time for Overtime.

11.     On August 15, 2008, as a result of the 2008 DOL Investigation, ATBI changed its salaries and payroll structure.  It raised store managers' salaries from $1500/month to $1820/month.[5]  It also began classifying assistant store managers as hourly employees entitled to overtime.

12.     After August 15, 2008, ATBI implemented some form of clock in/clock out policy using the computers in each store.  However, ATBI did not present any evidence or cross-examine any Plaintiffs regarding their hours worked using contemporaneous time records.  Thus, such records played no role in this case and are not part of the record.

13.     Plaintiffs Jones, Madden, and Phillips did not testify at trial.  All other 23 Plaintiffs testified at trial.

14.     Plaintiffs Kaiser, Colvin, Richardson, Shipley, Ashton, Chancellor, Still, Cantrell, McCullough, Ingram, Howard, Morgan, Vaughn, and Briscoe were employed at stores in Oklahoma.

15.     Plaintiffs Thompson, Carmody, Balakas, Fritz, Mullen, Rauch, and Olson were employed at stores in Colorado.

16.     Plaintiff Bayack was employed at a store in Kansas.

17.     Plaintiff Stein was employed at a store in Arizona.

18.     Stuart and Chappell testified at trial as to ATBI's corporate practices and policies.  Stuart was ATBI's office manager and payroll supervisor at all relevant times.  Stuart did not make decisions as to whether an employee was classified as exempt or non-exempt under the FLSA but simply followed directions from ATBI's management.  Chappell was the regional manager over Oklahoma and Kansas at all relevant times.  Chappell has worked in nearly every capacity within

---

[5]  At trial, the evidence showed that this salary increase for store managers actually occurred August 15, 2008, rather than October 2008, as testified by Stuart in her deposition and found by the Court in the Order.  Thus, this finding in the Order is amended by these Findings of Fact and Conclusions of Law.

ATBI, including sales, store manager, district manager, and regional manager. Effective 2010, she became the Chief Operations Officer.

**I.      § 213(a)(1) Exemptions**

**A.      Before August 15, 2008**

19.     At all times prior to August 15, 2008, Plaintiffs' salaries ranged from $1100/month – $1500/month. Reduced to a weekly equivalent, Plaintiffs' salaries ranged from $253.85/week – $364.15/week. Such salaries were inadequate for Plaintiffs to qualify for exempt status. *See* Conclusions of Law 87-89.[6]

**B.      August 15, 2008 - December 1, 2008**

20.     On or around August 15, 2008, following the 2008 DOL Investigation, ATBI (1) raised store managers' salaries to $1820/month, payable in amounts of $910 on a semimonthly basis, *i.e.*, on the 1st and 15th of the month; and (2) began paying assistant store managers an hourly rate plus overtime pay for hours worked in excess of 40. Store managers' salaries were still inadequate for Plaintiffs to qualify for exempt status based on the timing of the $910 payments on a semimonthly rather than biweekly basis. *See* Conclusions of Law 87-89.[7]

21.     On December 1, 2008, ATBI made a $455.00 "adjustment payment" to store managers. According to Stuart, ATBI understood its full FLSA salary obligations in August 2008, but waited approximately 105 days to change from $910.00 semimonthly payments to the $910.00 biweekly payments required by the FLSA. It did so, according to Stuart, for the benefit of its employees:

_____

[6] Based on the inadequate salary level, the Court need not make any additional factual findings regarding the salary basis or duties tests relevant to the § 213(a)(1) exemptions.

[7] Based on the inadequate salary level, the Court need not make any additional factual findings regarding the salary basis or duties tests relevant to the § 213(a)(1) exemptions.

> Well, when we changed the payroll structure, we allowed employees the time to get their finances together by changing the pay dates, the biweekly from semimonthly, the 1st and the 15th.  So this check was to supplement the difference between those 90 days.
> . . .
> I'm saying we did it as a courtesy to our employees to adjust their financial situations.
> . . .
> [I]f I had an ACH or an EFT coming out on the 1st for my home mortgage, and I was expecting a paycheck on the 1st, and if all of a sudden my pay period changed to the 5th or the 8th or whatever the other Monday was, then that mortgage could actually bounce.

(Tr. 895, 931.)  This explanation does not make logical sense, did not stand up on cross-examination, and is not credible.  Instead, the Court finds that ATBI still did not understand its salary obligations, even after the 2008 DOL Investigation, and that ATBI made the adjustment payment upon discovery of its continued non-compliance with the FLSA.

### C.     After December 1, 2008

22.     Effective December 1, 2008, ATBI began paying store managers $1820/month, payable in amounts of $910 on a biweekly, rather than semimonthly, basis.[8]

23.     Prior to December 1, 2008, there was evidence that ATBI took deductions from managers' paychecks for two practices: (1) failing to make a night deposit immediately after a closing shift ("late night deposit"), and (2) failing to open a store on time ("late store opening").  Plaintiffs and ATBI representatives consistently testified that these policies existed.  Further, several Plaintiffs testified that such deductions were regularly taken.  However, all such deductions occurred prior to December 1, 2008.

---

[8]  Because this salary was adequate, it is necessary to make factual findings regarding the salary basis and duties tests.

24.     After December 1, 2008, there is no evidence of deductions taken from any of the relevant Plaintiffs' paychecks for late night deposits or late store openings. Stuart testified at trial that she did not take any such deductions from store managers' paychecks after September 1, 2008. At least with respect to late store openings, Stuart was responsible for checking the stores' computers and determining if a store was opened late. The Court believes Stuart's trial testimony that, after September 1, 2008, she did not make any deductions from store managers' paychecks for late store openings, even if the computer indicated that a store had been opened late.[9]

25.     Plaintiff Stein, a store manager in Arizona, testified that she witnessed her assistant manager's paycheck being reduced for late store openings in the post-December 1, 2008 time frame. However, after December 1, 2008, assistant managers were reclassified by ATBI as non-exempt and were being paid as hourly employees. Thus, this testimony does not convince the Court that ATBI had an actual practice of taking any disqualifying deductions from store managers during the post-December 1, 2008 time frame.

26.     Plaintiffs' testimony indicated that late store openings and late night deposits occurred on a regular basis, even among otherwise diligent store managers. The fact that no deductions were taken during the post-December 1, 2008 time frame, either from the relevant Plaintiffs or any other store managers, indicates that ATBI had ceased making any actual deductions for these types of infractions.

---

[9] The Court is aware that this trial testimony contradicted Stuart's prior deposition testimony, wherein she testified that ATBI continued to take such deductions as late as October 2009. The Court is further aware that there is no way to verify Stuart's trial testimony from ATBI's payroll records because such deductions would have been grouped in a "MISC" category, which included other deductions for missing or purchased product. Nonetheless, the Court believes Stuart's trial testimony on this issue, and Plaintiffs did not present any persuasive contrary evidence as to the existence of actual deductions during the post-December 1, 2008 time frame.

27.     There is evidence that, in the post-December 1, 2008 time frame, ATBI maintained written policies regarding deductions for late night deposits and store openings, which were targeted at salaried store managers and signed by some Plaintiffs.  For example, on June 30, 2009, Plaintiff Howard signed a document entitled "New Deposit Policy," which reiterated the requirement that managers make nightly deposits directly after their closing shift.  This document could not have been an "old" document, as speculated by Stuart, because the document states that it is effective June 30, 2009.  Under the policy, the first infraction would result in a $100 payroll deduction, the second would result in $100 payroll deduction and suspension, and the third would result in a $100 payroll deduction and termination.  Howard also signed a document entitled "Late Opening Policy," which reiterated the requirement that managers open their stores on time.  The first infraction would result in a $50 payroll deduction, the second would result in a $50 payroll deduction and suspension, and the third would result in a $50 payroll deduction and termination.

28.     For all claims arising after December 1, 2008, all relevant Plaintiffs held the position of store managers.[10]  The employee handbook describes store managers' responsibilities as follows:

> Manages the daily operation of a retail store including customer service, sales, and inventory control.  Consistently achieves all salon sales goals.  Implements and reviews store policies and procedures.  Supervises staff, sets sales goals, and trains new hires.  Relies on experience and judgment to plan and accomplish goals.  The salon manager contributes to the success of [ATBI] by supervising and coordinating the activities of salon employees to ensure friendly, professional, efficient, and courteous service is provided to customers in a clean, well-maintained environment.

(Pls.' Ex. 43 at 19.)

29.     Based on the trial testimony, the relevant Plaintiffs' duties included hiring, firing, completing disciplinary write-ups, completing incident reports, assuring that maintenance was performed,

---

[10]  The Court refers to store managers with claims arising after December 1, 2008 as "relevant Plaintiffs" or "these Plaintiffs."

ordering supplies for the store, and supervising and training salespeople, bed technicians, and assistant managers. These Plaintiffs also completed non-managerial tasks such as sitting at the front desk, running the register, and cleaning tanning beds, particularly when they were the only employees in the store at a certain time. Considering all Plaintiffs' testimony and Chappell's testimony, the Court finds that the relevant Plaintiffs spent approximately 30-40% of their time on managerial tasks, and 60-70% on non-managerial tasks.

30.     The evidence demonstrated that these Plaintiffs generally supervised at least four individuals per store, including sales people, bed technicians, and an assistant manager. The relevant Plaintiffs, all of whom were employed as store managers, hired these employees, set these employees' schedules, and regularly directed their work. Relevant Plaintiffs also had the authority to hire and fire all employees in their store.

## II.     Hours Worked

31.     In addition to scheduled hours, all store managers were required to attend weekly manager meetings, which lasted from 1.5 - 4 hours and were led by district managers. The meeting durations varied depending on the content of the meetings and the identity of the district manager. One district manager in Tulsa, Shanda Keys ("Keys"), conducted lengthy manager's meetings.

32.     In addition to scheduled hours, some Plaintiffs were required to attend monthly sales meetings, which ranged from 1-3 hours.

33.     In addition to scheduled hours, some Plaintiffs were required to attend "lotion" training meetings approximately twice per year. These sessions lasted approximately 1-4 hours.

34.     In addition to scheduled hours, Plaintiffs were required to complete opening and closing duties.  On average, opening duties took approximately 15 minutes, and closing duties took

approximately 30 minutes.  Closing duties included making a nightly deposit at a 24-hour banking location after Plaintiffs left their stores.

35.     In Tulsa, ATBI had "fitness stores," which included fitness equipment in addition to tanning beds.  Tulsa was therefore referred to as a "fitness market," and Plaintiffs employed in Tulsa were required to complete "prospecting" duties.  Such duties involved soliciting businesses near their store and distributing promotional materials.  Relevant Plaintiffs were required to obtain a specific number of "prospects," ranging from 10-20 per day. Typically, prospecting was done outside regularly scheduled hours.  If a manager had someone else to cover the store, prospecting could potentially be completed during scheduled hours.  Keys, the Tulsa market district manager at relevant times, placed great emphasis on prospecting.

36.     Chappell's testimony that prospecting could generally be completed during scheduled hours and without leaving the store was not credible.  Plaintiffs' testimony regarding prospecting was credible.  For example, Shipley testified that she was required to get 20 prospects 6 days per week and that this typically took 1-2 hours following her scheduled shift.

37.     Plaintiffs were often *scheduled* to work hours well in excess of forty hours per week by their district manager.

38.     Plaintiffs were also "called in" by their district manager to work one or more shifts in addition to those they were scheduled.  Occasionally, these "call-in" shifts were compensated, if Plaintiffs' district manager chose to report the extra shift to Stuart.[11]  The rate of compensation was $64.00/8-hour shift.  Reporting of extra shifts was a sporadic occurrence, and there was no set policy or consistent practice of compensating Plaintiffs for call-in shifts.

------

[11]  Call-in shifts were also referred to as "sixth day shifts" by some witnesses.

39.     If employees managed by Plaintiffs called in sick or quit, Plaintiffs were expected to cover the shift and keep the store open at all times.

40.     Notwithstanding the handbook's explanation of salaried employees' "irregular" workweeks, Chappell testified that Plaintiffs were scheduled in a manner so as not to exceed a 40-hour workweek.  For example, she testified that managers were scheduled only 38 in-store hours, leaving 2 remaining hours for their attendance at the required weekly manager meetings:

> A.     You would have a 7 to 3 shift and you'd have a 3 to 11, and the managers would be scheduled 3 to 11 Monday through Thursday, then they would be scheduled Saturdays, it's 8 to 2.  And the reason that we do that, Richard, is because Monday through Thursday are our busiest days that are going to see the most clients, and that's when it's the most important person to have in that role so that they can make sure that they handle with experience that they have being a manager.
>
> Q.     Wouldn't the managers' meeting then add an extra two hours to a 40-hour shift?
>
> A.     No, because when they're working Saturday, it's a six-hour shift.  It covers the possible two hours, but our managers' meetings don't last for two hours. They last at the most an hour and a half.

(Tr. at 958.)  Chappell also testified that ATBI district managers employed this same scheduling strategy to compensate for time spent at sales meetings and lotion meetings.  Chappell's testimony that Plaintiffs' hours generally did not exceed 40 hours per week was not credible.

41.     In sum, the Court finds that Plaintiffs' excess weekly hours included in-store operational hours (extra shifts), opening duties, closing duties, manager meetings, sales meetings, lotion meetings, and prospecting (Tulsa market only).  Particular Plaintiffs' testimony, such as Kaiser and Shipley, carried significant weight with the Court and persuaded the Court that ATBI's general practice was to (1) require Plaintiffs to work a significant number of hours in excess of 40 hours per week, and (2) fail to pay overtime compensation in accordance with the FLSA.

42.     The Court finds that those Plaintiffs entitled to judgments worked between 48 and 62.5 average hours per week.  The Court finds that no Plaintiff worked in excess of an average of 62.5 hours per week.  The Court finds three instances in which Plaintiffs' estimates of hours were inflated in light of their specific testimony, their district managers, and/or their store locations.  In these three instances, the Court finds that Plaintiffs' average hours were actually 60 hours per week.  The Court has therefore reduced these Plaintiffs' estimated hours to 60 hours.

43.     Plaintiff Ashton's estimate of 70 average hours per week is inflated.  Based on Ashton's testimony, the Court finds that 60 average hours per week is a reasonable and credible estimate.

44.     Plaintiff Balakas's estimate of 60 average hours per week is a reasonable and credible estimate.

45.     Plaintiff Cantrell's estimate of 60 average hours per week is a reasonable and credible estimate.

46.     Plaintiff Carmody's estimate of 60 average hours per week is a reasonable and credible estimate.

47.     Plaintiff Chancellor's estimate of 80 average hours per week is inflated.  Based on Chancellor's testimony, the Court finds that 60 average hours per week is a reasonable and credible estimate.

48.     Plaintiff Colvin's estimate of 57.5 average hours per week is a reasonable and credible estimate.

49.     Plaintiff Ingram's estimate of 60 average hours per week is a reasonable and credible estimate.

50.     Plaintiff Kaiser's estimate of 62.5 average hours per week is a reasonable and credible estimate.

51.     Plaintiff McCullough's estimate of 60 average hours per week is a reasonable and credible estimate.

52.     Plaintiff Richardson's estimate of 60 average hours per week is a reasonable and credible estimate.

53.     Plaintiff Shipley's estimate of 62 average hours per week is a reasonable and credible estimate.

54.     Plaintiff Still's estimate of 60 average hours per week is a reasonable and credible estimate.

55.     Plaintiff Thompson's estimate of 70 hours per week is inflated.  Based on Thompson's testimony, the Court finds that 60 average hours per week is a reasonable and credible estimate.

56.     Plaintiff Bayack's estimate of 60 average hours per week is a reasonable and credible estimate.

57.     Plaintiff Howard's estimate of 50.5 average hours per week is a reasonable and credible estimate.

58.     Plaintiff Mullen's estimate of 48 average hours per week is a reasonable and credible estimate.

59.     Plaintiff Olson's estimate of 52 average hours per week is a reasonable and credible estimate.

60.     Plaintiff Rauch's estimate of 55 average hours per week is a reasonable and credible estimate.

61.     Plaintiff Vaughn's estimate of 52 average hours per week is a reasonable and credible estimate.

### III.      Statute of Limitations/Liquidated Damages

62.      From at least October 2005 (the date of the first unpaid overtime claim) until December 1,

2008 (the cut-off date for recovery),[12] ATBI showed reckless disregard for whether its conduct

violated the FLSA.  Further, ATBI did not establish that its payment decisions were based on a

reasonable belief that its conduct complied with the FLSA.

63.      Until August 15, 2008, ATBI took no steps whatsoever to comply with the FLSA in paying

Plaintiffs.  Neither Stuart, Chappell, or anyone else at ATBI had education, training, or experience

in FLSA compliance.  Neither Stuart, Chappell, or anyone else at ATBI sought outside assistance

with FLSA compliance.  Neither Stuart, Chappell, or anyone else at ATBI reviewed any state or

federal laws to determine if Plaintiffs were being properly paid under the FLSA.

64.      Even following the 2008 DOL Investigation, ATBI continued to pay an insufficient salary

to classify Plaintiffs as exempt.  ATBI's explanation that it delayed proper payments for a 105-day

period for the benefit of Plaintiffs is not credible.  Instead, the Court finds that ATBI did not exercise

responsible diligence in discharging its FLSA obligations.   In light of all the circumstances

presented and ATBI's specific notice of FLSA violations, this continued failure to pay a sufficient

salary demonstrates reckless disregard even during the August - December 2008 time frame.

65.      Although ATBI started as a small business, ATBI was a large business with hundreds of

employees at the time of the FLSA violations.  Despite this fact, ATBI failed to take any steps, such

as consulting outside sources, providing training or education for its payroll manager, and/or

inquiring of state or federal authorities about the FLSA's requirements.  ATBI failed to take those

steps for an unreasonably long period of time.  This resulted in FLSA violations of a serious and

---

[12]   *See* Conclusion of Law 107.

15

significant magnitude that could have and should have been avoided. The Court finds ATBI's disregard for the FLSA to be particularly egregious in light of the large amount of overtime hours Plaintiffs were required to work. It is inexcusable that ATBI did not inquire, research, or attempt to confirm whether Plaintiffs were being properly and adequately paid for their overtime hours.

**IV.    Beaucourt's Testimony**

66.    ATBI presented Kimberly Beaucourt ("Beaucourt") as a damages expert. Beaucourt holds a CPA and other related degrees and is employed as a managing consultant specializing in litigation consulting, business valuation, and fraud investigation.

67.    Beaucourt's Report and testimony consisted of three general categories: (1) identifying mathematical errors in Plaintiffs' damages calculations; (2) identifying methodological errors in Plaintiffs' damages calculations; and (3) developing her own damages calculations.

68.    Beaucourt's damages calculations consist of four "scenarios," which demonstrate four different factual time frames for recovery – (1) September 2006 - August 2008; (2) September 2005 - August 2008; (3) October 2006 - Plaintiff End Date; and (4) All Periods Claimed. Within each scenario, there are four "categories," which demonstrate different factual estimates of hours worked – (A) Overtime Based on Payroll Records; (B) Average Hours Determined by U.S. Department of Labor; (C) Overtime Hours Based on Payroll Records and Considering a 48-Hour Workweek; and (D) Average Hours as Estimated by Plaintiff. Thus, Beaucourt provided 16 different calculations which vary based on factual assumptions regarding (1) the recovery period; and (2) the hours worked.

69.    Based on the Court's factual findings, Beaucourt's Scenario 4 (All Periods Claimed), Category D (Average Hours as Estimated by Plaintiffs) was the most relevant set of calculations

provided.  Thus, this set of calculations served as a useful starting point for the Court in developing its own damages model and completing its own sample calculation.

## V.      Damages

70.      Stuart and Chappell consistently testified that Plaintiffs' fixed salary was intended to compensate them for a 40-hour, 5-shift workweek.  Their testimony was that, if Plaintiffs' hours exceeded 40 in one week, Plaintiffs were to receive a call-in shift payment in the amount of $64.00 for every shift worked in addition to their 40-hour workweek.  As explained above, Chappell also testified that managers were scheduled for fewer than 40 operational hours during weeks when they would be required to attend manager, sales, and lotion meetings.  Thus, ATBI witnesses maintained that Plaintiffs' salary was intended to compensate them for a 40-hour workweek and that they took steps to compensate Plaintiffs for certain "overtime" hours.  This appears to be inconsistent with the handbook, which would define Plaintiffs as "exempt" from FLSA overtime requirements based on Plaintiffs' receipt of set salaries.

71.      This contradiction between the handbook and the trial testimony of ATBI's witnesses has made this case somewhat unique.  In one sense, it is a "misclassification" case, *i.e.*, Plaintiffs were classified as "exempt" and paid a salary for all hours worked, but were paid insufficient salaries to actually qualify for exempt status.  In another sense, it is not a "misclassification" case because ATBI's corporate representatives maintained that they were attempting to schedule Plaintiffs 40 hours in any given week and then pay them certain "overtime" payments for any extra shifts.  This indicates that ATBI considered Plaintiffs hourly employees entitled to some form of overtime payment.  If this were a straight-forward "misclassification" case, ATBI would have routinely required Plaintiffs to work in excess of 40 hours, without being concerned about any overtime payments.

72.     Further, as this Court held at the summary judgment stage (based on Stuart's deposition testimony), ATBI did not reach any understanding with Plaintiffs that their fixed salary was intended to cover all hours worked in any given week.  Therefore, ATBI could not avoid FLSA liability by showing that it compensated Plaintiffs consistent with the fluctuating workweek method explained at 29 C.F.R. § 778.114 ("FWW method").  *See Kaiser*, 2010 WL 5114729, at *18-21 (granting summary adjudication to Plaintiffs on ATBI's FWW defense).  As explained in more detail in Conclusions of Law 135-142, the trial evidence also supports this conclusion.

73.     To the extent the Court has had difficultly fitting this case into established FLSA damages models, such difficulty was caused by ATBI and not by Plaintiffs.  Therefore, in discerning the proper damages calculation, the Court has erred on the side of awarding Plaintiffs greater damages, rather than rewarding ATBI for its lack of knowledge and lack of consistent explanation for its payment decisions.

74.     Further complicating the damages calculation is the fact that Plaintiffs received bonuses and commissions in addition to their fixed monthly salaries and extra compensation for call-in shifts.  Bonuses were earned by meeting certain store goals, such as a "lotion average" and a particular "close ratio." (Tr. at 960.)[13]  Commissions were paid "on 5 to 10 percent on lotion, depending on whether [Plaintiffs] made their averages or not, and 3.5 [percent] commission on memberships sold." (*Id.* at 961.)

75.     The parties presented different total damages calculations and different damages formulas.  Plaintiffs' proposed damages formula is demonstrated by the following proposed calculation of overtime due to Plaintiff Cantrell for April 2006:

---

[13]  It is not disputed that these production bonuses were non-discretionary bonuses, as that term is used in FLSA regulations.

<table>
<tr><td colspan="2" align="center">April 2006</td></tr>
</table>

|     |     |     |     |
| --- | --- | --- | --- |
| I. | Salary | $1200 per month paid bi monthly [sic] | |
| II. | Estimated hours worked per week | 60.0 or 260.00 per month (60.0 x 52 / 12) | |
| III. | Regular rate for pay period including salary, non discretionary bonus and commissions | 1200 $\qquad$ 1710.88 $\qquad$ 2910.88 ÷173.33 $\qquad$ 16.79 | salary bonus commissions |
| IV. | Overtime rate | 16.79 x 1.5 = 25.19 | |
| V. | Overtime hours worked in period | 2560 – 173.33 (52 x 40 / 12) = 86.67 | |
| VI. | Amount due for worked but unpaid overtime for month | 86.67 x 25.19 = 2183.28 | |

76.    ATBI's proposed damages formula, presented by and through Beaucourt and her Second Supplemental Expert Report ("Beaucourt Report"), is demonstrated by the following proposed calculation of overtime due to Cantrell for April 2006:[14]

|  | 4/01/06 | 4/15/06 |
| --- | --- | --- |
| **Compensation Category** | | |
| Salary | $ 600.00 | $ 600.00 |
| Bonus | | |
| Commissions | | $ 2214.11 |

---

[14]  Beaucourt's calculations are per pay period and must be added together in order to compare them to Plaintiffs' calculations, which are per month.

| | | |
|---|---|---|
| Other | | |
| **Total Compensation Per Pay Date Paid to Plaintiff** | **$ 600.00** | **$ 2,814.11** |
| | | |
| **Hours Per Week** | **60.00** | **60.00** |
| Hours Per Pay Date | | |
| (Hours per Week, Multiplied by 52 weeks, divided by 24 Pay Dates per Year) | 130.00 | 130.00 |
| | | |
| Federal Minimum Wage | $ 5.15 | $ 5.15 |
| | | |
| **Regular Pay Rate Per Hour** | **5.15** | **21.65** |
| **Overtime Pay Rate Per Hour (Regular Pay Rate multiplied by 1.5)** | **$ 7.73** | **$ 32.48** |
| | | |
| Hours Per Week | 60.00 | 60.00 |
| Short Work Period Adjustment per Plaintiff (Converted from monthly adjustment to pay) | | |
| Adjusted Hours Per Week | 60.00 | 60.00 |
| | | |
| Total Regular Hours Per Pay Date | 86.67 | 86.67 |
| Total Overtime Hours Per Pay Date | 43.33 | 43.33 |
| | | |
| **Total Regular Pay Per Pay Date (Regular Hours multiplied by Regular Pay Rate)** | **$ 446.35** | **$ 1,876.41** |
| **Total Overtime Pay Per Pay Date (Overtime Hours multiplied by Overtime Pay Rate)** | **$ 334.94** | **$ 1,407.36** |
| **Less: Total Compensation Already Paid to Plaintiff** | **($ 600.00)** | **($ 2,814.11)** |
| | | |
| **Overtime Compensation Due** | **$ 181.29** | **$ 469.66** |

77.   As demonstrated, Plaintiffs contend that Cantrell's total unpaid overtime for April 2006 is $2,183.28, while ATBI contends the total is $650.95.

78.   Based on these differing formulas, Plaintiffs calculate total compensatory damages at $719,506.43, while ATBI calculates total compensatory damages at $172,513.44.

79.   As demonstrated by the Cantrell example, there are also some factual discrepancies between Plaintiffs' and Defendant's data for commissions.  For example, Plaintiffs used $1710.88 as the

April 2006 commission amount, while ATBI used $2214.11. This discrepancy exists because Plaintiffs included the commission in the month it was earned (April 2006), while Beaucourt included the commission in the pay period when it was paid (May 15, 2006).[15] For purpose of calculating back due overtime for any given pay period, the Court finds it most efficient, equitable, and reasonable to include commission in the total compensation for the pay period in which it was paid, rather than earned. This is due to the organization and presentation of the underlying payroll data and other specific facts in this case. Thus, the Court will utilize the compensation amounts set forth in the Beaucourt Report for any given semimonthly pay period.

80.     To the extent there are any other discrepancies in data, the Court finds that Beaucourt's extrapolation and analysis of the payroll data is more reliable and is set forth in a more useful format (*i.e.*, per pay period). Therefore, in completing calculations in accordance with the Court's damages model, *see infra* Conclusions of Law Sections V and VIII, the parties shall use the data as set forth and summarized by Beaucourt.

81.     The key difference between the parties' damages formulas is the divisor used to derive a regular rate of pay. Plaintiffs utilized a divisor based upon a 40-hour workweek (173.33 is the monthly equivalent of a 40-hour workweek), and Beaucourt utilized a divisor based on total hours worked, including overtime hours. As explained below, both parties utilized a 1.5 overtime rate.

## Conclusions of Law

### I.      § 213(a)(1) Exemptions

82.     The FLSA exempts from its overtime requirement any "employee employed in a bona fide executive, administrative, or professional capacity." 29 U.S.C. § 213(a)(1); *see Archuleta v. Wal-*

---

[15]  Stuart testified that any commissions earned were paid on the 15th of the following month.

*Mart Stores, Inc.*, 543 F.3d 1226, 1228 (10th Cir. 2008).  "While it is the employee's burden to prove that the employer is violating the FLSA, it is the defendant employer's burden to prove that an employee is exempt from FLSA coverage."  *Archuleta*, 543 F.3d  at 1233 (internal citation omitted).

83.     Exemptions to the FLSA must be narrowly construed, and the employer must show that the employee fits "plainly and unmistakenly" within the exemption's terms.  *See id.*; *see also Baden-Winterwood v. Life Time Fitness, Inc.*, 566 F.3d 618, 626 (6th Cir. 2009) ("The applicability of an FLSA exemption is an affirmative defense that an employer must establish by a preponderance of the evidence.").

84.     ATBI contends that certain Plaintiffs, at relevant times, qualified for the executive and administrative exemptions.  The federal regulations contain the following test for determining whether an employee is employed in a bona fide *executive* capacity:

> a) The term "employee employed in a bona fide executive capacity" in section 13(a)(1) of the Act shall mean any employee:
> (1) Compensated on a salary basis at a rate of not less than $455 per week . . . exclusive of board, lodging or other facilities;
> (2) Whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;
> (3) Who customarily and regularly directs the work of two or more other employees; and
> (4) Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.
> (b) The phrase "salary basis" is defined at § 541.602; . . . "primary duty" is defined at § 541.700; and "customarily and regularly" is defined at § 541.701.

29 C.F.R. § 541.100.

85.     The federal regulations contain the following test for determining whether an employee is employed in a bona fide *administrative* capacity:

(a) The term "employee employed in a bona fide administrative capacity" in section 13(a)(1) of the Act shall mean any employee:

(1) Compensated on a salary or fee[16] basis at a rate of not less than $455 per week . . . exclusive of board, lodging or other facilities;

(2) Whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and

(3) Whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.

(b) The term "salary basis" is defined at § 541.602; . . . and "primary duty" is defined at § 541.700.

29 C.F.R. § 541.200 (footnote added).

86.     Under either regulation, an employee's position must satisfy three general tests in order to qualify for the relevant exemption: (1) a salary level test; (2) a salary basis test; and (3) a duties test. *See Baden-Winterwood,* 566 F.3d at 626-27.

### A.     Before August 15, 2008

87.     The salary level test, which requires payment at a rate of not less than $455/week, "will be met if the employee is compensated biweekly on a salary basis of $910, semimonthly on a salary basis of $985.83, or monthly on a salary basis of $1,971.66." 29 C.F.R. § 541.600(b).

88.     Prior to August 15, 2008, ATBI paid Plaintiffs an amount significantly less than $455/week. Thus, ATBI has failed to show that Plaintiffs were paid sufficient salaries to qualify for the executive or administrative exemptions during this time frame, and Plaintiffs were non-exempt employees entitled to FLSA overtime. The Court need not reach the salary basis test or the duties test.

---

[16]  Neither party contends that Plaintiffs were compensated on a "fee basis," and this aspect of the administrative exemption is not at issue.

### B.    August 15, 2008 - December 1, 2008

89.    After August 15, 2008, ATBI began paying Plaintiffs $910.00 semimonthly, or on the 1st and 15th of every month.  This was still not a sufficient salary under 29 C.F.R. § 541.600(b), which requires semimonthly payments in the amount of $985.83.  Thus, ATBI has failed to show that Plaintiffs were paid sufficient salaries to qualify for the executive or administrative exemptions during this time frame, and Plaintiffs were non-exempt employees entitled to FLSA overtime.  The Court need not reach the salary basis test or the duties test.

90.    On December 1, 2008, ATBI made a $455.00 "adjustment payment" to store managers.  *See* Finding of Fact 21.  ATBI contends that this adjustment payment prevents it from losing an executive or administrative exemption for the August 15, 2008 - December 1, 2008 time frame pursuant to the "window of correction" rule set forth at 29 C.F.R. § 541.603(c).[17]

91.    Generally, the window of correction rule is relevant to whether an employer has demonstrated the salary *basis* component of the executive, administrative, or professional exemptions.  *See Klem v. Cnty. of Santa Clara, Cal.*, 208 F.3d 1085, 1090 (9th Cir. 2000) ("The 'salary basis' test also includes a window of correction through which an employer may remedy certain improper deductions from an exempt employee's salary.").  This provision, which is a subpart of the regulation entitled "Effect of improper deductions from salary," states: "Improper deductions that are either isolated or inadvertent will not result in loss of the exemption for any employees subject to such improper deductions, if the employer reimburses the employees for such improper deductions."  29 C.F.R. § 541.603(c).

---

[17]   ATBI cited the former version of the regulation, which was set forth at 29 C.F.R. § 541.118(a)(6).  However, the current version was in place during relevant times.

92.     As authority for extending the window of correction rule to its violation of the salary *level* test during the August 15, 2008 - December 1, 2008 time period, ATBI cited a 2003 DOL opinion letter.  *See* DOL Op. Letter, 2003 WL 23374601 (July 9, 2003).  Such letter indeed indicates that something akin to the window of correction rule may apply to isolated or inadvertent dips in an employee's salary *level* due to "an employee's time-entry error or omission or other clerical or mechanical error or omissions that results in an initial payment" in an amount less than the required amount of weekly salary.  *See id.* ("Any shortage that results from the employee's error or omission may be adjusted by completing an adjustment form (a process that is consistent with the window of correction contained in 29 C.F.R. § [541.603(c)]).  The fact that an adjustment process exists to correct such errors indicates that any initial underpayments caused by time-entry errors, like clerical and mechanical errors, are inadvertent and may be part of any payroll system that is subject to human error.").

93.     The window of correction rule does not apply to ATBI's $455.00 adjustment payment made on December 1, 2008.  As explained above, the window of correction rule generally prevents employers from losing an exemption based upon an isolated or inadvertent instance of an improper "docking" of pay, rather than an improper reduction of the requisite salary level.  Even assuming the window of correction rule or something similar extends to corrections made for inadvertent or isolated dips in salary levels, that is not what occurred in this case.  ATBI's payment of less than the required salary, during the August 15, 2008 - December 1, 2008 time frame, was not isolated, inadvertent, or the result of any technical or mechanical error.  It was the result of a company-wide decision that applied to all store managers for a 105 day period, which consisted of eight consecutive pay periods.  This is not the type of incidental violation that the "window of correction" rule is intended to remedy.  Therefore, the Court rejects ATBI's attempt to avoid overtime liability for the

August 15, 2008 - December 1, 2008 time frame based on its adjustment payment and 29 C.F.R. § 541.603(c).

### C.    After December 1, 2008

94.    For all periods on or after December 1, 2008, ATBI has satisfied its burden of demonstrating that the relevant Plaintiffs (those with claims during pay periods beginning or after December 1, 2008) qualified for the executive exemption.  Specifically, ATBI has demonstrated that, during this time period, it was paying the requisite salary level, it was paying on a salary basis, and these Plaintiffs' duties satisfied the executive exemption duties test.  Therefore, such Plaintiffs were exempt employees and are not entitled to unpaid overtime after December 1, 2008.  The Court will address how ATBI has satisfied its burden as to each of the three tests.

### 1.    Salary Level Test

95.    Effective December 1, 2008, ATBI began paying store managers $910 on a biweekly basis, which satisfies the salary level test.  *See* 29 C.F.R. § 541.600(b).

### 2.    Salary Basis Test

96.    To satisfy the salary basis test, ATBI bears the burden of proving that relevant Plaintiffs were paid: (1) a predetermined amount, which (2) was not subject to reduction (3) based on quality or quantity of work performed.  *See Baden-Winterwood*, 566 F.3d at 627.  The relevant regulations, as amended in 2004, provide substantial guidance in determining whether an employee's salary is subject to reduction:

> a) An employer who makes improper deductions from salary shall lose the exemption if the facts demonstrate that the employer did not intend to pay employees on a salary basis. An actual practice of making improper deductions demonstrates that the employer did not intend to pay employees on a salary basis. The factors to consider when determining whether an employer has an actual practice of making improper deductions include, but are not limited to: the number of improper deductions, particularly as compared to the number of employee infractions

warranting discipline; the time period during which the employer made improper deductions; the number and geographic location of employees whose salary was improperly reduced; the number and geographic location of managers responsible for taking the improper deductions; and whether the employer has a clearly communicated policy permitting or prohibiting improper deductions.

(b) If the facts demonstrate that the employer has an actual practice of making improper deductions, the exemption is lost during the time period in which the improper deductions were made for employees in the same job classification working for the same managers responsible for the actual improper deductions. Employees in different job classifications or who work for different managers do not lose their status as exempt employees. Thus, for example, if a manager at a company facility routinely docks the pay of engineers at that facility for partial-day personal absences, then all engineers at that facility whose pay could have been improperly docked by the manager would lose the exemption; engineers at other facilities or working for other managers, however, would remain exempt.

29 C.F.R, § 541.603.

97.     Based on the wording of the amended regulations, the Court agrees with the Sixth Circuit that the "significant likelihood" test first set forth by the Supreme Court in *Auer v. Robbins*, 519 U.S. 452, 461 (1997), is no longer good law. *See Baden-Winterwood*, 566 F.3d at 627-28 (explaining that regulations effective in 2004 effectively eliminated "substantial likelihood" test set forth in *Auer* and that "actual practices" test must apply to any claims arising after date of amendment). Thus, the question is whether, during the time period after December 1, 2008 (when ATBI finally satisfied the salary level test), ATBI had an actual practice of taking improper deductions from Plaintiffs' salaries based upon late store openings or late night deposits.

98.     Considering all relevant factors and Findings of Fact 24-27, ATBI did not have an actual practice of taking payroll deductions for either late store openings or late night deposits on or after December 1, 2008.  Although ATBI did have a threatening policy in place at this time, there were no actual deductions taken.  Without evidence of at least one actual deduction during the relevant time frame, the Court cannot find that ATBI had an "actual practice" of taking improper deductions. *See Baden-Winterwood*, 566 F.3d at 630 (applying "actual practices" test) (affirming district court's

conclusion that absence of any actual deductions during relevant time period was dispositive of actual practices test); *Monroe Firefighters Ass'n v. City of Monroe*, 600 F. Supp. 2d 790, 798-99 (W.D. La. 2009) (granting summary adjudication that firefighters were paid on a salary basis) ("[T]o the extent that the post-August 23, 2004 regulations require an actual disciplinary deduction and to the extent that these regulations are controlling, there is no evidence that any District or Deputy Chief ever suffered a twelve-hour deduction from pay for missing out.").

99.     The evidence indicates that ATBI likely did, at certain earlier times, have an actual practice of taking improper deductions.  However, these deductions all occurred before December 1, 2008 and were applied to Plaintiffs with claims ending before that date.  Based on the wording of the regulations, the Court must specifically consider the circumstances applicable during the time frame of the relevant claims.  *See* 29 C.F.R. § 541.603(b) ("If the facts demonstrate that the employer has an actual practice of making improper deductions, the exemption is lost *during the time period in which the improper deductions were made* for employees in the same job classification working for the same managers responsible for the actual improper deductions.") (emphasis added).  Despite its written policies, the evidence indicates a marked change in ATBI's actual implementation of such policies following the 2008 DOL Investigation and specifically following December 1, 2008.

100.    ATBI has satisfied the salary basis test by demonstrating that it did not have an actual practice of reducing Plaintiffs' salaries based on late store openings or late night deposits for those Plaintiffs with claims beginning on or after December 1, 2008.

3.   **Duties Test**[18]

101.   The duties test for the executive exemption, set forth in 29 C.F.R. § 541.100(a)(2)-(4), includes only those employees (1) "[w]hose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;" (2) "[w]ho customarily and regularly direct[] the work of two or more other employees;" and (3) "[w]ho ha[ve] the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight."  29 C.F.R. § S41.100(a)(2-4).

### a.   Primary Duty of Management

102.   The ATBI stores managed by Plaintiffs are customarily recognized departments or subdivisions of ATBI's enterprise.  *See* 29 C.F.R. § 541.103(b) ("When an enterprise has more than one establishment, the employee in charge of each establishment may be considered in charge of a recognized subdivision or enterprise.").

103.   Plaintiffs' "primary duty" was "management" of their specific store.  "Primary duty" means "the principal, main, major, or most important duty that the employee performs."  29 C.F.R. § 541.700(a).  "Management" includes activities

> such as interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and

---

[18]   Plaintiff's objection to "duties" evidence as outside the scope of the pretrial order is overruled.  Such evidence is relevant to Plaintiff's issues of law 1 and Defendant's issues of law 27, and 30-36, as listed in the Pretrial Order.

sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures.

*Id.* at § 541.102.

104.   The regulations provide a guideline that employees spending 50% of their time on exempt, managerial tasks will generally satisfy the primary duty requirement, but they also state that "time alone . . . is not the sole test." 29 C.F.R. § 541.700(b). The regulations explain that an assistant manager at a retail store who spends more than 50% of his time on non-exempt tasks, such as running the cash register, but who also performs exempt executive work may still have management as his primary duty:

> Thus, for example, assistant managers in a retail establishment who perform exempt executive work such as supervising and directing the work of other employees, ordering merchandise, managing the budget and authorizing payment of bills may have management as their primary duty even if the assistant managers spend more than 50 percent of the time performing nonexempt work such as running the cash register. However, if such assistant managers are closely supervised and earn little more than the nonexempt employees, the assistant managers generally would not satisfy the primary duty requirement.

*Id.* § 541.700(c).

105.   In addition to managerial duties, Plaintiffs spent considerable time on non-exempt work such as sitting at the front desk, running the cash register, and cleaning tanning beds. *See* Findings of Fact 28-29. However, there is no question that Plaintiffs were simultaneously managing the store and bearing overall responsibility for the store. Both case law and the regulatory example cited above pertaining to assistant managers, 29 C.F.R. § 541.700(c), support the conclusion that all relevant Plaintiffs (those with claims for pay periods on or after December 1, 2008) had the primary duty of management, even though time spent on exempt tasks was sometimes less than 50%. *See Thomas v. Speedway SuperAmerica, LLC*, 506 F.3d 496, 499 (6th Cir. 2007) (manager of Speedway

chain of gas station/convenience store had primary duty of management, although she was supervised by district manager who visited her store once or twice per week and although she spent 60% of her time on non-managerial tasks); *Jones v. Va. Oil Co.*, 69 Fed. Appx. 633, 637 (4th Cir. 2003) (holding that Dairy Queen manager had primary duty of management, where manager spent approximately 75-80% of her time carrying out basic line-worker tasks because "while [she] was doing line-worker tasks, she also engaged in the supervision of employees, handled customer complaints, dealt with vendors, and completed daily paperwork"); *Donovan v. Burger King Corp. (Burger King I)*, 672 F.2d 221, 226-27 (1st Cir. 1982) (holding that "Burger King assistant managers have management as their primary duty"); *Donovan v. Burger King Corp. (Burger King II)*, 675 F.2d 516, 520-22 (2d Cir.1982) (holding that Burger King assistant managers "have, as their 'primary duty,' managerial responsibilities"); *Murray v. Stuckey's Inc. (Murray I)*, 939 F.2d 614, 617-20 (8th Cir. 1991) (holding that the store manager of "an isolated gasoline station, convenience store[,] and restaurant[ ] had management as his or her primary duty"); *Moore v. Tractor Supply Co.*, 352 F. Supp. 2d 1268, 1279 (S.D. Fla. 2004) (finding that a manager of a retail store had management as his primary duty). *Sturm v. TOC Retail, Inc.*, 864 F. Supp. 1346, 1352-53 (M.D. Ga.1994) (finding that the managers of a convenience store had management as their primary duty); *Horne v. Crown Cent. Petroleum, Inc.*, 775 F. Supp. 189, 190-91 (D.S.C. 1991) (finding that a manager of a convenience store had "management of her store" as her "primary duty").

### b.      Directed Work of Two or More Employees and Authority to Hire/Fire

106.    The regulations require that Plaintiffs regularly direct the work of two full-time employees or their equivalent.  *See* 29 C.F.R.§ 541.104(a) ("To qualify as an exempt executive under § 541.100, the employee must customarily and regularly direct the work of two or more other

employees.  The phrase "two or more other employees" means two full-time employees or their equivalent. One full-time and two half-time employees, for example, are equivalent to two full-time employees.  Four half-time employees are also equivalent.").  Based on Finding of Fact 30, the second and third regulatory requirements are clearly met.

107.    The Court concludes that Plaintiffs were exempt executive employees as of December 1, 2008.  Plaintiffs Fritz, Stein, Briscoe, and Morgan's claims all arise after December 1, 2008, and ATBI is entitled to judgment in its favor as to these Plaintiffs.  All other Plaintiffs' claims arise in whole or in part prior to December 1, 2008 and are entitled to at least some judgment in their favor.

## II.    Hours Worked

### A.    Reasonableness of Plaintiffs' Estimates

108.    "An employee seeking to recover unpaid minimum wages or overtime under the FLSA 'has the burden of proving that he performed work for which he was not properly compensated.'" *Brock v. Seto*, 790 F.2d 1446, 1447-48 (9th Cir. 1986) (quoting *Anderson v. Mt. Clemens Pottery Co.,* 328 U.S. 680, 687 (1946)).  However, where an employer violates its statutory duty to keep proper records of hours, as ATBI has done here, an employee carries this burden "if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of a just and reasonable inference." *Brock*, 790 F.2d at 1448 (internal quotations omitted).  "The burden then shifts to the employer to show the precise number of hours worked or to present evidence sufficient to negate the reasonableness of the inference to be drawn from the employee's evidence." *Id.* (internal quotations omitted).  "If the employer fails to make such a showing, the court may then award damages to the employee, even though the result be only approximate." *Id.* (internal quotations omitted).  The policy underlying such rule is that, when an employer fails to keep sufficient time records, the

"solution is not to penalize the employee by denying him any recovery on the ground that he is unable to prove the precise extent of uncompensated work." *Id.* (internal quotations omitted).

109.    As a general matter, the testifying Plaintiffs have presented sufficient evidence of their hours worked as a matter of a just and reasonable inference, and ATBI has failed to negate the reasonableness of such inference.  ATBI did not present any testimony of Plaintiffs' direct supervisors or any other employees in a position to regularly observe or schedule Plaintiffs' work hours.  Instead, ATBI presented only the testimony of Chappell, who was a regional manager at relevant times.  Chappell did not demonstrate familiarity with Plaintiffs' daily work schedules or hours to negate the reasonableness of their testimony.  Further, Chappell's attempt to discredit individual Plaintiffs' estimates with anecdotal accounts of workplace incidents was entirely unavailing.

110.    ATBI also urged the Court to consider the amount of call-in shift payments, as set forth in the payroll records, as evidence negating the reasonableness of Plaintiffs' estimate.  However, the Court is in no way persuaded that such payments were made for all overtime shifts or hours worked.  Instead, the Court finds that such payments were made sporadically and only when a district manager chose to report the overtime to Stuart.  There was no written or set policy regarding these payments, and there was no consistent action taken by ATBI to ensure such payments were made.  Therefore, the payments for call-in shifts, as reflected in the payroll records, do not accurately reflect the overtime worked or cause the Court to question the general accuracy of Plaintiffs' estimates.

111.    ATBI also relied upon the DOL's estimate of an average of 48 hours per week to negate the reasonableness of Plaintiffs' estimates.  However, the DOL investigator did not have the benefit of each Plaintiff's trial testimony.  This Court has the benefit of Plaintiffs' specific testimony, which

has not been rebutted with any contemporaneous time records, supervisor's testimony, or other persuasive evidence.

112.    Therefore, except in three instances where the Court believed Plaintiffs' estimates were inflated in light of their own testimony, their store location, and other surrounding circumstances, the Court has utilized Plaintiffs' estimated hours worked.

###    B.    Prospecting

113.    ATBI urges the Court to conclude that any time spent by Plaintiffs on "prospecting," *see* Finding of Fact 35, should not be included in any estimate of Plaintiffs' total hours.  In support of this argument, ATBI cites 29 C.F.R. § 541.503.

114.    This regulation, entitled "promotion work," is set forth in Subpart F of Part 541, which governs the exemption for "Outside Sales Employees."[19]  The "promotion work" regulation explains:

> (a) Promotion work is one type of activity often performed by persons who make sales, which may or may not be exempt outside sales work, depending upon the circumstances under which it is performed. *Promotional work that is actually performed incidental to and in conjunction with an employee's own outside sales or solicitations is exempt work*. On the other hand, promotional work that is incidental to sales made, or to be made, by someone else is not exempt outside sales work. An employee who does not satisfy the requirements of this subpart may still qualify as an exempt employee under other subparts of this rule.
> (b) A manufacturer's representative, for example, may perform various types of promotional activities such as putting up displays and posters, removing damaged or spoiled stock from the merchant's shelves or rearranging the merchandise. Such an employee can be considered an exempt outside sales employee if the employee's primary duty is making sales or contracts. Promotion activities directed toward

---

[19]  Plaintiffs' Motion to Strike Portion of Defendant's Proposed Findings of Fact and Conclusions of Law Relating to 'Promotion Work' (Doc. 191) is denied.  ATBI argued that "Plaintiffs' claim for compensation for prospecting was made for [the] first time at trial."  (Def.'s Resp. to Pls.' Mot. to Strike 2.)  Plaintiffs did not file a reply brief or otherwise dispute this assertion.  Under these circumstances, the Court finds it proper to consider ATBI's proposed conclusions of law regarding the promotion work regulation.

> consummation of the employee's own sales are exempt. Promotional activities designed to stimulate sales that will be made by someone else are not exempt outside sales work.

29 C.F.R. § 541.503 (emphasis added).  ATBI argues that prospecting is promotional work "that is actually performed incidental to and in conjunction with an employee's own outside sales or solicitations," *see id.*, and should therefore be excluded from the relevant Plaintiffs' total hours worked.

115.    As evidenced by its wording and location within the regulations, the purpose of 29 C.F.R. § 541.503 is to provide guidance in distinguishing between (1) promotional tasks that qualify as "exempt" and therefore contribute to a finding that an employee's "primary duty" is outside sales, and (2) promotional tasks that do not qualify as exempt and therefore do not contribute to a finding that an employee's "primary duty" is outside sales.  *See* 29 U.S.C. § 541.500(a)(1) (requiring that "primary duty" of outside sales employees be making sales or obtaining orders); *id.* § 541.700 (defining "primary duty" for all exemptions (executive, administrative, outside sales, etc.) as requiring that the employee's primary duty be the performance of exempt work); *id.* § 541.702 (defining exempt work as that described within each of the relevant subparts); *see also Delgado v. Ortho-McNeil, Inc.*, No. 07-00263, 2009 WL 2781525, at *3 (C.D. Cal. Feb. 6, 2009) (citing 29 C.F.R. § 541.503 as guidance in determining whether pharmaceutical sales representatives qualified for outside sales exemption).

116.    The "promotion work" regulation contained in Subpart F has no application to the Court's analysis.  During the time periods of recovery, Plaintiffs were not paid sufficient salaries to qualify for the executive or administrative exemptions.  Nor has Defendant demonstrated, or even attempted to demonstrate, that Plaintiffs' primary duty was outside sales.  Even assuming prospecting qualifies as "exempt" work under 29 C.F.R. § 541.503, the Court finds no authority for carving out discrete

exempt tasks from a non-exempt employee's FLSA recovery.  The Court understands the regulation to be aimed at determining an overall classification as exempt or non-exempt rather than providing authority for reducing a non-exempt employee's recovery.  Therefore, the Court has considered hours spent prospecting by relevant Plaintiffs in determining their estimated weekly hours worked.

## III.    Statute of Limitations/Liquidated Damages

117.    The FLSA generally imposes a two-year statute of limitations unless the defendant's violations are shown to be willful, in which case a three-year period applies.  *Mumby v. Pure Energy Servs. (USA), Inc.*, 636 F.3d 1266, 1270 (10th Cir. 2011); 29 U.S.C. § 255(a).  "To fall under the three-year limitation, the plaintiff must show that the employer either knew or showed reckless disregard for the matter of whether its conduct violated the statute."  *Mumby*, 636 F.3d at 1270 (internal quotation marks omitted).  "Reckless disregard can be shown through action entailing an unjustifiably high risk of harm that is either known or so obvious that it should be known."  *Id.* (internal quotation marks omitted).

118.    "Generally, an employer in violation of the FLSA is liable for both compensatory damages as well as 'an additional equal amount as liquidated damages,' essentially doubling the plaintiffs' damage award."  *Id.* at 1272 (quoting 29 U.S.C. § 216(b)).  "However, if the employer can establish that his conduct was both in good faith and based on a reasonable belief that his conduct was not in violation of the FLSA, the court may, in its discretion, award less or no liquidated damages."  *Id.*; 29 U.S.C. § 260.  The same facts supporting a finding of willfulness or reckless disregard for purposes of the statute of limitations generally support a finding of an unreasonable belief for purposes of liquidated damages.  *See Mumby*, 636 F.3d at 1272 ("The same facts that support the district court's conclusion that Pure Energy's failure to fully compensate Plaintiffs' weekly overtime

was willful also support the district court's conclusion that Pure Energy's belief that it was complying with the FLSA was unreasonable.").

119.    Based on Findings of Fact 62-65, the Court concludes that ATBI showed "reckless disregard" for whether its conduct violated all FLSA and was not based on any "reasonable belief" of compliance with the FLSA.  Therefore, all actionable claims are subject to a three-year statute of limitations under 29 U.S.C. § 255(a), and all compensatory damages shall be liquidated in accordance with 29 U.S.C. § 216(b)**.**

## IV.    Beaucourt's Testimony

120.    The Court allowed Beaucourt to testify during trial, but the Court still must determine whether her expert opinion testimony satisfied Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579 (1993).  *See Gonzales v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620, 635 (6th Cir. 2000) (explaining that "district courts conducting bench trials have substantial flexibility in admitting proffered expert testimony at the front end, and then deciding for themselves during the course of trial whether the evidence meets the requirements of [*Kumho Tire Company, Limited v. Carmichael*, 526 U.S. 137 (1999)] and *Daubert* and deserves to be credited").

121.    A "witness qualified as an expert by knowledge, skill, experience, training, or education" may testify as to "scientific, technical, or other specialized knowledge." Fed. R. Evid. 702.  In order to determine whether an expert opinion is admissible, the court performs a two-step analysis.  First, the court must determine whether the expert is qualified by knowledge, skill, experience, training, or education to render an opinion.  *See 103 Investors I, L.P. v. Square D Co.*, 470 F.3d 985, 990 (10th Cir. 2006).  Second, if the expert is so qualified, the court must determine whether the opinion is "reliable" under the principles set forth in *Daubert* and *Kumho Tire Company*.  *See id.*

37

122.    The Court concludes that Beaucourt has specialized knowledge in performing damages calculations for purposes of litigation, investigations, and other matters.  Beaucourt's opinion as to the amount of damages is reliable to the extent that she ran various calculations based on specific factual scenarios, using ATBI's payroll records and ATBI's proposed FLSA damages model.  This does not mean that she employed the legally correct FLSA damages model or that such damage model will be adopted wholesale by the Court.  Nonetheless, her expert testimony regarding how she completed the calculations, how she applied the regulations, and her actual number crunching was helpful to the Court in (1) understanding ATBI's damages theory, as applied to the facts, and (2) interpreting payroll data and using such data in the actual calculations.  Therefore, certain aspects of her testimony are admissible as expert opinion testimony under Federal Rule of Evidence 702 and *Daubert*.  However, Beaucourt's testimony was not reliable or helpful to the extent she presented opinions drawing legal conclusions regarding the FLSA.  The Court has not given such opinion testimony any "expert" or other weight and has reached its own legal conclusions regarding the proper FLSA damages model to use in this case.

## V.    Damages

### A.    General Law and Regulations

123.    The Court's aim in awarding compensatory damages under the FLSA is to make Plaintiffs whole – that is, to award overtime wages that Plaintiffs should have received had ATBI complied with the FLSA.  *Lupien v. City of Marlborough*, 387 F.3d 83, 90 (1st Cir. 2004) (explaining that the plaintiffs were entitled to be made whole but were not entitled to a windfall at the defendant's expense); *Parker v. Burnley*, 703 F. Supp. 925, 927 (N.D. Ga. 1988) ("The purpose of the damage provisions of the FLSA . . . is to make whole an employee whose rights have been violated.").  In

order to make Plaintiffs whole, the Court must first determine what they should have been paid, had

ATBI complied with the FLSA.

124.    "The FLSA generally requires covered employers to pay its employees overtime pay for

work in excess of forty hours a week." *Chavez v. City of Albuquerque*, 630 F.3d 1300, 1304 (10th

Cir. 2011).

125.    All overtime hours "must be compensated at a rate not less than one and one-half times the

regular rate at which the employee is actually employed." 29 C.F.R. § 778.107.  The regular rate

is the "hourly rate actually paid the employee for the normal, nonovertime workweek for which he

is employed." 29 C.F.R. § 778.108 (emphasis added).  The regulations provide the general equation

for deriving the regular hourly rate:

> The regular hourly rate of pay of an employee is determined by dividing *his total
> remuneration for employment*[20] (except statutory exclusions) in any workweek *by the
> total number of hours actually worked by him in that workweek for which such
> compensation was paid.*[21]

29 CFR § 778.109 (emphasis and footnotes added).

126.    Where non-exempt employees are paid on a "piece-rate, salary, commission, or other basis,"

the overtime compensation due to employees must be computed on the basis of the hourly rate

derived therefrom.  29 C.F.R. § 778.109.  Unless specifically excluded from the regular rate

calculation, *see* 29 U.S.C. § 207(e)(1)-(8); 29 C.F.R. §§ 778.400-778.421,[22] the numerator of the

---

[20]  The "total renumeration for employment" is the numerator in the regular rate equation.

[21]  The "total number of hours actually worked by him in that workweek for which such
compensation was paid" is the divisor in the regular rate equation.

[22]  There are no applicable statutory exclusions in this case.

regular rate equation "must include all remuneration for employment paid to, or on behalf of, the employee." 29 U.S.C. § 207(e).

127.    The regulations provide examples of how to calculate the regular rate depending on how and when employees are compensated. If an employee is employed "solely on the basis of a single hourly rate, the hourly rate is the 'regular rate.'" 29 C.F.R.§ 778.110(a). If an hourly employee receives a production bonus, the regulations explain how to calculate the regular hourly rate as follows:

> If the employee receives, in addition to the earnings computed at the $12 hourly rate, a production bonus of $46 for the week, the regular hourly rate of pay is $13 an hour (46 hours at $12 yields $552; the addition of the $46 bonus makes a total of $598; this total divided by 46 hours yields a regular rate of $13). The employee is then entitled to be paid a total wage of $637 for 46 hours (46 hours at $13 plus 6 hours at $6.50, or 40 hours at $13 plus 6 hours at $19.50).

29 CFR § 778.110(b). In this example, the total renumeration for employment ($598) was divided by the total hours worked (46), rather than divided by the normal, nonovertime 40-hour workweek.

128.    The final parenthetical in § 778.110(b) example is helpful in understanding that the employee is receiving a 1.5 overtime rate for the extra 6 hours, regardless of how the computation is completed. In the first computation (46 hours at $13 plus 6 hours at $6.50), the regular rate is first applied to all hours worked (even overtime hours), such that the outstanding amount to be paid is only .5 of the regular rate (to reach a total 1.5 multiplier to such rate) on the 6 overtime hours. In the second computation, the regular rate is only applied to the first 40 hours of work, such that 1.5 times the regular rate must be applied to the 6 overtime hours. The calculations simply show two different ways to reach the same result of paying the 1.5 overtime rate required by statute.

129.    If an employee is employed "solely" on a salary basis – whether weekly, monthly, or based on some other period – "the regular hourly rate of pay . . . is computed by dividing the salary by the

number of hours which the salary is intended to compensate." 29 C.F.R. § 778.113(a). The regulations explain:

> If an employee is hired at a salary of $350 and if it is understood that this salary is compensation for a regular workweek of 35 hours, the employee's regular rate of pay is $350 divided by 35 hours, or $10 an hour, and when the employee works overtime the employee is entitled to receive $10 for each of the first 40 hours and $15 (one and one-half times $10) for each hour thereafter. If an employee is hired at a salary of $375 for a 40–hour week the regular rate is $9.38 an hour.

*Id.*

130.    The regulations also address a situation in which an employee receives a fixed salary for a fluctuating workweek, rather than a set workweek. This regulation is commonly referred to as the FWW regulation or FWW method:

> An employee employed on a salary basis may have hours of work which fluctuate from week to week and the salary may be paid him pursuant to an understanding with his employer *that he will receive such fixed amount as straight time pay for whatever hours he is called upon to work in a workweek, whether few or many. Where there is a clear mutual understanding of the parties that the fixed salary is compensation (apart from overtime premiums) for the hours worked each workweek, whatever their number, rather than for working 40 hours or some other fixed weekly work period,* such a salary arrangement is permitted by the Act if the amount of the salary is sufficient to provide compensation to the employee at a rate not less than the applicable minimum wage rate for every hour worked in those workweeks in which the number of hours he works is greatest, *and if he receives extra compensation, in addition to such salary, for all overtime hours worked at a rate not less than one-half his regular rate of pay. Since the salary in such a situation is intended to compensate the employee at straight time rates for whatever hours are worked in the workweek, the regular rate of the employee will vary from week to week and is determined by dividing the number of hours worked in the workweek into the amount of the salary to obtain the applicable hourly rate for the week.* Payment for overtime hours at one-half such rate in addition to the salary satisfies the overtime pay requirement because such hours have already been compensated at the straight time regular rate, under the salary arrangement.

29 C.F.R. § 778.114(a) (emphasis added).[23]  Again, under the FWW method, the employee is still entitled to a 1.5 overtime rate for hours worked in excess of 40.  The rationale for applying a .5 multiplier to overtime hours in a FWW situation is that the employer has already paid the employee a 1.0 or "straight-time rate" for the overtime hours.   The employer only owes additional compensation at .5 of the regular rate, rather than 1.5 of the regular rate, because the parties agreed that the fixed salary covered all hours worked instead of a typical 40-hour workweek.[24]

131.    If an employee receives commission payments in addition to a fixed salary, they must be included in the numerator of the regular rate equation:

> Commissions (whether based on a percentage of total sales or of sales in excess of a specified amount, or on some other formula) are payments for hours worked and must be included in the regular rate. This is true regardless of whether the commission is the sole source of the employee's compensation or is paid in addition to a guaranteed salary or hourly rate, or on some other basis, and regardless of the method, frequency, or regularity of computing, allocating and paying the commission.  It does not matter whether the commission earnings are computed daily, weekly, biweekly, semimonthly, monthly, or at some other interval. The fact that the commission is paid on a basis other than weekly, and that payment is delayed for a time past the employee's normal pay day or pay period, does not excuse the employer from including this payment in the employee's regular rate.

29 C.F.R. § 778.117.

132.    The commission regulations explain how to calculate the regular rate when an employee receives commissions, in addition to other compensation, on a workweek basis:

> When the commission is paid on a weekly basis, it is added to the employee's other earnings for that workweek . . ., and the total is divided *by the total number of hours worked in the workweek* to obtain the employee's regular hourly rate for the particular workweek. The employee must then be paid *extra compensation* at

---

[23] This regulation was based on the Supreme Court's decision in *Overnight Motor Transportation Company v. Missel*, 316 U.S. 572 (1942).

[24] The FWW method, and the Court's rejection thereof, is discussed in more detail below.

one-half of that rate for each hour worked in excess of the applicable maximum hours standard.

29 C.F.R. § 118 (emphasis added).  As with the example for production bonuses paid to an hourly employee in 29 C.F.R. § 778.110(b), the employee earning commissions is not receiving something less than a 1.5 overtime rate on his commissions.  Taking half of the commission rate to arrive at the "extra compensation" owed for commissions is simply the same shortcut that is illustrated and explained in § 778.110(b).  *See* Conclusions of Law 127-128.

133.  The commission regulations also explain how to compensate an employee for deferred commissions.  *See* 29 C.F.R. §§ 778.119-120.  In § 778.119, the regulations explain:

> When the commission can be computed and paid, additional overtime compensation due by reason of the inclusion of the commission in the employee's regular rate must also be paid.  To compute this additional overtime compensation, it is necessary, as a general rule, that the commission be apportioned back over the workweeks of the period during which it was earned. The employee must then receive additional overtime compensation for each week during the period in which he worked in excess of the applicable maximum hours standard. *The additional compensation for that workweek must be not less than one-half of the increase in the hourly rate of pay attributable to the commission for that week multiplied by the number of hours worked in excess of the applicable maximum hours standard in that workweek.*

(emphasis added).  The regulations further explain that, for deferred commission payments that are not identifiable as earned in particular workweeks, "some other reasonable and equitable method must be adopted."  29 C.F.R. § 778.120.  One method is to assume the employee earned equal amounts of commission in each week of the commission computation period, which is explained as follows:

> (2) Once the amount of commission allocable to a workweek has been ascertained for each week in which overtime was worked, the commission for that week is divided by the total number of hours worked in that week, to get the increase in the hourly rate. Additional overtime due is computed by multiplying one-half of this figure by the number of overtime hours worked in the week. A shorter method of obtaining the amount of additional overtime compensation due is to multiply the

amount of commission allocable to the week by the decimal equivalent of the fraction

Overtime hours
 Total hours x 2

A coefficient table (WH-134) has been prepared which contains the appropriate decimals for computing the extra half-time due.

Examples:

(I) If there is a monthly commission payment of $416, the amount of commission allocable to a single week is $96 ($416x12=$4,992/52=$96). In a week in which an employee who is due overtime compensation after 40 hours works 48 hours, dividing $96 by 48 gives the increase to the regular rate of $2. Multiplying one-half of this figure by 8 overtime hours gives the additional overtime pay due of $8. The $96 may also be multiplied by 0.083 (the appropriate decimal shown on the coefficient table) to get the additional overtime pay due of $8.

. . .

29 CFR § 778.120(a)(2)(I).  All regulatory examples related to commissions, whether paid contemporaneously or on some deferred basis, use actual total hours worked as a divisor.

134.     The regulations described above are intended to explain how to contemporaneously compensate an employee for his overtime hours rather than to provide a formula for calculating back-due wages in FLSA litigation.  Nonetheless, they serve as guidance in determining what amount ATBI should have paid Plaintiffs in the first instance and, therefore, how much is owed to Plaintiffs as a fair and reasonable amount of compensatory damages.

### B.     Rejection of FWW Method

135.     Under Tenth Circuit law, courts are authorized to calculate back-due overtime wages in accordance with 29 C.F.R. § 778.114 (the FWW method), so long as all regulatory elements are satisfied.  *See Clements v. Serco, Inc.*, 530 F.3d 1224, 1230-31 (10th Cir. 2008) (affirming use of § 778.114 as authority for calculating unpaid overtime in accordance with the FWW method).  *But see Urnikis-Negro v. Am. Family Prop. Servs.*, 616 F.3d at 665, 675 (7th Cir. 2010) (holding that

§ 778.114(a) is "not a remedial measure" and that the regulation's "focus instead is on how an

employer may comply with its statutory obligations in the first instance and avoid liability for breach

of those obligations") (citing *Clements* as an example of courts' improper reliance upon § 778.114(a)

to fashion relief in FLSA misclassification cases).[25]

136.    If the FWW method requirements are met, (1) the divisor for the regular rate of pay is the

total actual hours worked, including any overtime hours; and (2) the multiplier applied to the total

overtime hours is .5 rather than 1.5.  *See* 29 C.F.R. § 778.114(a).  However, as explained above, the

.5 multiplier is based upon the prior payment at a straight-time rate for hours in excess of 40.  *See*

*id.*  ("Payment for overtime hours at one-half such rate in addition to the salary satisfies the overtime

pay requirement *because such hours have already been compensated at the straight time regular*

*rate, under the salary arrangement*") (emphasis added).  In other words, where such an agreement

exists, an employee has "agreed to receive straight time pay for all hours worked in a given

workweek" and has "already received such pay."  *Desmond v. PNGI Charles Town Gaming, L.L.C.*,

630 F.3d 351, 357 (4th Cir. 2011).  Thus, the compensatory loss suffered by an employee with a

fluctuating workweek who has not received any overtime pay is "the 50% premium for their

overtime hours."  *Id.*

137.    The decision of whether to employ the FWW method has a large impact on an employee's

compensatory damages.  The Seventh Circuit explained:

> The district court's decision to apply the FWW method substantially reduced the
> damages awarded to [plaintiff] in two ways. First, by dividing her weekly salary by
> the total number of hours she worked in a week rather than by 40, the FWW method
> reduced the hourly wage constituting her regular rate of pay. Second, by presuming
> that the fixed weekly wage paid to [plaintiff] was meant to constitute payment at the

---

[25]  The Seventh Circuit relied upon *Missel*, rather than § 778.114(a), as its authority for
affirming a damages calculation similar to that explained in § 778.114(a).  *See id.* at 680-84.

regular rate for all of the hours she worked, including overtime, it reduced the overtime pay she was owed from 150 percent of the regular rate to just 50 percent of her regular rate. Had her weekly salary been deemed to cover a standard 40-hour workweek instead of any and all hours worked in a given week, her regular rate of pay, as mentioned, would have been $25 per hour and she would have received one and one-half times that rate, or $37.50 per hour, for all hours over 40 per week. [Plaintiff's] total pay for the 1,490.5 overtime hours she worked would have been $55,893.75, and an award of an equal sum as liquidated damages would have brought her total damages to $111,787.50-more than four times what she actually received. Put another way, use of the FWW method reduced her total recovery by more than 75 percent.

*Urnikis-Negro*, 616 F.3d at 672.

138.    As an initial matter, the Court rejects ATBI's argument that a "clear mutual understanding" is only a required element for purposes of determining whether an employer has *complied* with the FWW method in the first instance and not for purposes of *calculating damages* in the event of an FLSA violation.  The *Clements* case is controlling as to this question.  *See Clements*, 530 F.3d at 1231 (precise issue on cross-appeal was whether district court properly calculated FLSA damages) ("By its own terms, § 778.114 applies *only if* there is a clear mutual understanding of the parties that the fixed salary is compensation for however many hours the employee may work in a particular week, rather than for a fixed number of hours per week.") (emphasis added) (internal quotation marks omitted).

139.    At trial, ATBI witnesses testified consistently with Stuart's prior deposition testimony, which the Court relied upon in rejecting the FWW method at the summary judgment stage.  Specifically, they testified at trial that Plaintiffs' fixed salaries were intended to cover a 5-shift, 40-hour workweek and that ATBI attempted to compensate Plaintiffs for any overtime by paying the $64.00 call-in shift payments.  Under these circumstances, the Court cannot hold that the parties had any understanding – let alone the "clear, mutual understanding" required by *Clements* – that Plaintiffs' fixed salary was compensation for however many hours they worked in a particular week.

140.     ATBI cites Plaintiffs' testimony as evidence that such an understanding existed and argues that Plaintiffs' acceptance of their compensation demonstrates an understanding that their straight-time pay was intended to cover more than a 40-hour workweek.   However, ATBI's problem in demonstrating a clear, mutual understanding lies in its own witness's testimony.   Had ATBI witnesses testified that they followed the "exempt" definition in the handbook, regularly required Plaintiffs to work in excess of 40 hours, and never paid them any additional compensation for overtime hours, the FWW method may have applied in this case.   But the Court will not ignore or disregard the employer's own stated intent that Plaintiffs' salary was intended to compensate Plaintiffs for a 5-shift, 40-hour workweek.   (*See, e.g.*, Tr. at 798.)   Such intent was communicated to Plaintiffs when ATBI compensated Plaintiffs by the sporadic and inconsistent $64.00 "overtime" payments.   Therefore, based on the evidence at trial, § 778.114(a) does not permit use of the FWW method to calculate damages.   *Cf. Clements*, 530 F.3d at 1230-31 (affirming use of regulatory FWW method where employees "understood that they . . . would not be paid more when they worked over forty hours").

141.     If § 778.114(a) is not applicable, courts apply the common-law presumption first explained by the Supreme Court in *Missel* "that an employee's fixed weekly salary was meant to compensate him solely for 40 hours of work even when he regularly worked more than 40 hours without any expectation of additional pay."   *Urnikis-Negro*, 616 F.3d at 679.   This presumption can be rebutted by evidence that the parties "have in fact agreed that a fixed weekly salary will constitute payment at the regular rate for any and all hours worked."   *See id.* (citing *Missell*, 316 U.S. at 580).

142.     Considering all evidence presented at trial, ATBI has not rebutted the presumption that Plaintiffs' fixed salaries were meant to compensate a 40-hour workweek and has not shown that the parties actually intended Plaintiffs' fixed salary to compensate for all hours worked.   Therefore,

common law principles set forth in *Missel* and its progeny also do not authorize use of a FWW method of calculating damages. *Cf. Desmond*, 630 F.3d at 356-57 (affirming district court's use of FWW type calculation based on factual finding that "there was an agreement that the fixed weekly salary covered all hours worked"); *Urnikis-Negro*, 616 F.3d at 681 (affirming district court's use of FWW type calculation because district court made unequivocal factual determination that "the plaintiff's wage was intended to compensate her not for 40 hours per week or some other fixed number of hours, but for *all* hours that she worked in a given week" and therefore complied with *Missell*).

### C.      Court's Formula for Regular Rate

143.    Beaucourt's calculations use Plaintiffs' semimonthly compensation as a starting point for calculating the regular rate, while Plaintiffs' calculations use Plaintiffs' monthly compensation as a starting point.  Although either method is acceptable and should yield a nearly identical hourly rate (assuming the same data and equations are used), the Court has chosen to calculate the regular rate using semimonthly compensation as a starting point.  The Court has done so in light of its conclusion, explained below, that different divisors must be used depending on whether Plaintiffs earned solely salary or salary plus other compensation for any given pay period.  Using a semimonthly payment as a starting point allows more precision for this analysis and ultimately benefits Plaintiffs.  In addition, the underlying payroll data is organized by semimonthly pay periods, which assists in using such data in the actual calculations.[26]

### 1.      Total Renumeration

---

[26]  In Tables XI and XII of Beaucourt's Report and their accompanying text, Beaucourt contends that Plaintiffs have incorrectly calculated the regular rate for any partial months of pay. The Court's damages model uses Beaucourt's method of adjusting for any partial periods, and the final damages calculations shall be completed in accordance therewith.

144.     In this case, the total renumeration for employment for any given semimonthly pay period potentially includes Plaintiffs' (1) semimonthly salary; (2) non-discretionary bonuses paid for that period, *see* 29 C.F.R. § 778.208 (explaining that non-discretionary bonuses "must be totaled in with other earnings to determine the regular rate on which overtime pay must be based"); (3) commissions paid for that period, *see id.* § 778.117 ("Commissions . . . are payments for hours worked and must be included in the regular rate."); and (4) any additional payments for call-in shifts, which are designated in Beaucourt's damages calculations and the underlying payroll records as "other."[27] All such amounts will be included in the numerator of the Court's equation for calculating the regular rate of pay.

### 2.     Divisor

145.     Having rejected the FWW justification for use of an actual hours worked divisor, the Court turns to the remaining regulations to determine the proper divisor for the regular rate.  The Court has had difficulty in applying such regulations to the facts presented.  In this case, the evidence showed that Plaintiffs were paid a salary that was "intended to compensate" them for a 40-hour workweek.  Thus, were the Court to complete its calculation under 29 C.F.R. § 778.113(a), which governs employees paid solely a salary, it would use the weekly salary as the numerator and 40 as the divisor in arriving at a regular rate.  It would then multiply the regular rate by 1.5 and multiply that number by overtime hours to derive remaining overtime amounts owed, as Plaintiffs have done in their proposed calculations.

---

[27] Plaintiffs excluded category (4) – "other" payments for call-in shifts – from its calculation, while Beaucourt included it.  When paid, this amount should be included in calculating Plaintiff's regular rate because it is not excluded by 29 U.S.C. § 207(e)(1)-(7) and it is expressly included by 29 U.S.C. § 778.310 (explaining that extra compensation paid in a lump sum for overtime hours must be included in the regular rate).  Inclusion of this amount ultimately benefits Plaintiffs.

146.     However, Plaintiffs were not always paid "solely" a salary.  For some semimonthly pay periods, they earned commissions, non-discretionary production bonuses, and payments for extra shifts, all of which must be included in the numerator.  This raises the question of, once the commissions, bonuses, and extra-shift payments ("additional compensation") are added to the numerator, should the divisor stay at 40 (as urged by Plaintiffs) or must the divisor change to the total actual hours worked (as urged by ATBI).  Plaintiffs' argument has appeal because it seems incorrect and unfair to change the divisor from 40 to total hours worked in instances where the additional compensation is only a small portion or no portion of the total renumeration for employment.[28]  ATBI's argument has appeal because, unlike Plaintiffs' salary (which was earned in total during their first 40 hours of work), the additional compensation was earned over all hours worked and/or exclusively during overtime hours.

147.     The Court concludes that, for any semimonthly pay periods in which Plaintiffs earned a commission, bonus, or other compensation in addition to their salary, the divisor used in deriving the regular rate of pay must be total hours worked.  The Court so concludes for two reasons.  First, in all examples provided in the regulations for calculating the regular rate when commissions or bonuses are included in the total renumeration of employment (the numerator), the divisor used is total hours worked.  *See, e.g.*, 29 C.F.R. §§ 778.110(b); 778.118; *see also* DOL Fact Sheet #23 ("Earnings may be determined on a piece-rate, salary, commission, or some other basis, but in all such cases the overtime pay due must be computed on the basis of the average hourly rate derived from such earnings.  This is calculated by dividing the total pay for employment in any workweek by the total number of hours actually worked.").

---

[28]  ATBI's damages model uses total hours worked as the divisor even for pay periods where Plaintiffs were only paid a salary.  *See, e.g.*, Finding of Fact 76.

148.     Second, the Tenth Circuit has recently issued an informative, although factually

distinguishable, decision.  In *Chavez v. City of Albuquerque*, 630 F.3d 1300 (10th Cir. 2011), the

plaintiffs were city employees paid at an hourly rate for a set workweek pursuant to various

collective bargaining agreements.  The agreements provided a contractual overtime rate of 1.5 times

the employee's straight-time rate of pay.  The agreements also provided for various types of "add-

on" pay – such as longevity, hazard, shift differential, assignment, education, and firearms

qualification pay.  These "add-on" payments were made as lump-sum payments on a biweekly basis

in addition to their hourly pay.  The city had calculated the plaintiffs' regular rate by adding their

hourly pay and "add-on payments" and dividing by the total hours worked.  The plaintiffs sued for

back due overtime, arguing that the city should have used their contractually set workweek (40

hours) as the divisor instead of their total hours worked.

> In framing the issue, the court stated:

> In this case, the first step in calculating the regular rate over a particular week is to total the week's straight time pay and add-ons.  The parties disagree as to the second step: whether this total should be divided by the CBA's "normal workweek," or the hours actually worked by the employee. *Conceptually, the issue is whether the add-ons are additional compensation for forty hours worth of work, or whether they are additional compensation for all work an employee may do in a given week.* If actual hours is used as the divisor, the value of the add-ons decreases as an employee works more overtime. If the normal workweek is used, an employee would receive additional add-ons for each overtime hour worked.

*Chavez*, 630 F.3d at 1311-12 (emphasis added).  The court also discussed the parties' dispute over

the meaning of the phrase "for which such compensation was paid" in 29 C.F.R. § 778.109:

> The parties offer differing constructions of this statement.  The City argues that it means that compensation is divided by total hours worked.  The Employees argue that overtime hours are not hours 'for which [add-on] compensation was paid,' so overtime is not included in the divisor.

*Id.* at 1313.

149.    The court held that the city's use of a total hours worked divisor was proper because it was "consistent with the statutory language" and was not "illogical, unreasonable, or unfair." *Id.* The court reasoned that: (1) the add-ons at issue in that case were "general compensation" rather than "additional hourly compensation" because the add-on payments were *not* tied to hours worked, production, or efficiency; and (2) 29 C.F.R. § 778.110(b), which uses a total hours worked divisor in the example of how to calculate the regular rate for an hourly employee who earns a production bonus, foreclosed the employees' argument. *Id.*[29]

150.    The Court recognizes that *Chavez* involved an hourly rate plus add-on payments, rather than a fixed salary plus add-on payments. This renders 29 C.F.R. § 778.110(b) directly applicable to the plaintiffs in *Chavez*, and it is less clear whether this provision has equal force in the context of a non-exempt salaried employee receiving a production bonus. However, the commission regulations clearly contemplate commissions added to a fixed salary, *see* 29 C.F.R. § 778.117, and also clearly require an hours worked divisor in deriving a regular rate, *see id.* § 778.118. Thus, *Chavez*'s general reasoning extends to this case. Specifically, the relevant regulatory examples appear to preclude Plaintiffs' proposal to use a 40-hour workweek divisor for any pay period that includes non-excludable compensation in addition to salary, such as commissions and bonuses.

151.    Therefore, for all semimonthly pay periods in which Plaintiffs received a bonus, commission, or call-in shift payment, the Court will utilize a total hours worked divisor in deriving a regular rate of pay. *See* 29 C.F.R. §§ 778.110(b) (calculating regular rate of pay where employee earned

---

[29] This Court struggled with the seeming inconsistency of using a "production bonus" as an example of "general compensation" that was not tied to hours worked, production, or efficiency. Nonetheless, whether viewed as "general compensation" or not, the Court is convinced by the regulations that the presence of commissions and non-discretionary bonuses in the numerator always requires a total hours worked denominator.

production bonus in addition to hourly rate by using actual hours worked divisor); 778.118-120 (calculating regular rate of pay where employee earned commissions in addition to other compensation by using actual hours worked divisor); *Chavez*, 630 F.3d at 1313 (affirming use of total hours worked divisor where "add-ons" were included in the numerator of the regular rate of pay equation). The Court acknowledges that, in light of the evidence presented, this spreads a weekly salary intended to compensate for a 40-hour workweek over a longer workweek. However, the Court simply finds no authority for using a 40-hour divisor when commissions, non-discretionary bonuses, and/or extra payments are included in the total renumeration for employment. Instead, all authority indicates that total hours is the proper divisor under these circumstances.

152.     For all semimonthly pay periods in which Plaintiffs received *solely* a salary, the Court will utilize a 40 hours worked divisor in deriving a regular rate of pay. For these periods, Plaintiffs were paid solely a fixed salary. According to ATBI's own witnesses, such salary was intended to compensate them for a 40-hour workweek *See* 29 C.F.R. § 778.113(a); *Urnikis-Negro*, 616 F.3d at 679 (explaining that, in determining the proper divisor to use in a misclassification case where an employee was paid a fixed salary, a court must first determine the number of hours that such salary was intended to compensate and that proper focus in calculating regular rate of pay for misclassified employee is on whether parties intended fixed salary to compensate employee for all hours worked in workweek or solely for first 40 hours). *Cf. Brantley v. Inspectorate Am. Corp.*, No. H-09-2439, 2011 WL 5190122, at *14 (S.D. Tex. Oct. 17, 2011) (rejecting use of FWW method but nonetheless using actual hours worked denominator for purpose of calculating regular rate of pay where the defendant had distributed a memorandum describing the FWW method to the plaintiffs, and plaintiffs had therefore received specific "notice that their non-overtime compensation did not correspond to a 40 hour work week").

153.    Deriving different regular rates for different weeks is not unusual and is contemplated by the regulations.[30]  This case is somewhat unique because of the non-applicability of the FWW method, which necessitates use of a 40-hour divisor in the "solely salary" pay periods.  The Court concludes that its calculations will result in a fair, make-whole amount of compensatory damages.

### D.    Court's Calculation of Back Due Wages

154.    As explained above, even where a .5 multiplier is used in the regulations to calculate overtime due, *see generally* Conclusions of Law 127, 130, 132, 133, the employee is always entitled to a 1.5 overtime rate.  The .5 multiplier is used in instances where the employee has already been compensated at the regular hourly rate for hours worked in excess of 40, such that only "half time" additional compensation is owed.

155.    Because it is an easier conceptual model, the Court's damages formula is the "long" calculation, which applies a 1.5 overtime rate regardless of whether the Court is utilizing a 40 hour divisor or actual hours worked divisor.  The Court's formula: (1) determines what total amount should have been paid to the employee in a given pay period, if he was properly paid straight time for 40 hours and 1.5 times his regular rate for hours worked in excess of 40; and then (2) subtracts amounts already paid to Plaintiff for that pay period; in order to (3) arrive at the amount of additional compensation needed to make Plaintiffs whole for that pay period.  After all compensable pay periods for that Plaintiff are totaled, that amount must be doubled in accordance with the liquidated damages provision.

156.    The Court's formula generally follows Beaucourt's formula as set forth in Scenario 4, Category D, *except* that in any periods for which Plaintiffs were paid solely on a salary basis, the

---

[30]  The Court has derived a regular rate per pay period because this is how the evidence was presented and to assist in ease of calculations.

Court has used 40 as the divisor in calculating the regular rate of pay.  Using the same example of Plaintiff Cantrell for April 2006, the Court offers the following example of the damages model it will employ in this case:

| Pay Date | 4/01/06 | 4/15/06 |
|---|---|---|
| **I.   Regular Rate Per Pay Period** | | |
| A.  Total Compensation | | |
| Salary | $ 600.00 | $ 600.00 |
| Bonus | | |
| Commission | | $ 2214.11 |
| Other | | |
| Total Compensation for Semi-Monthly Pay Period ("Pay Period Compensation") | $ 600.00 | $ 2814.11 |
| B.  Divisor | | |
| Actual Weekly Hours Worked | 60.00 | 60.00 |
| Weekly Hours Worked For Which Compensation Was Paid ("Weekly Hours") (Use 40 hours if paid solely salary for pay period.  Use actual hours if paid salary plus any bonus, commission, or other for pay period.) | 40.00 | 60.00 |
| Conversion of Weekly Hours to Semi-Monthly Pay Period ("Pay Period Hours") (Weekly Hours multiplied by 52 weeks, divided by 24 yearly pay dates) | 86.67 | 130.00 |
| C.  Regular and Overtime Rates | | |
| Regular Hourly Rate ("Regular Rate")  (Pay Period Compensation Divided by Pay Period Hours) (Use Federal Minimum Wage ($5.15/hour) if regular rate is less than $5.15/hour) | $ 6.92 | $ 21.65 |
| Overtime Hourly Rate Per Hour ("Overtime Rate")  (Regular Rate multiplied by 1.5) | $ 10.38 | $ 32.48 |
| | | |

| II.  Regular and Overtime Hours Worked Per Pay Period[31] | | |
|---|---|---|
| Total Regular Hours Per Pay Period ("Pay Period Regular Hours") (Weekly hours up to 40 multiplied by 52 weeks, divided by 24 yearly pay dates) | 86.67 | 86.67 |
| Total Overtime Hours Per Pay Date ("Pay Period Overtime Hours") (Hours over 40 per week, multiplied by 52, divided by 24 yearly pay dates) | 43.33 | 43.33 |
| | | |
| **III.  Amounts Due Per Pay Period** | | |
| Total Regular Pay Due ("Regular Pay") (Pay Period Regular Hours multiplied by Regular Rate) | $ 600.00[32] | $1876.41 |
| Total Overtime Pay Due ("Overtime Pay") (Pay Period Overtime Hours multiplied by Overtime Rate) | $ 449.76 | $ 1407.36 |
| Total Compensation Paid to Plaintiff ("Prior Payment") | $ 600.00 | $2814.11 |
| | | |
| Total Overtime Compensation Due for Pay Period (Regular Pay + Overtime Pay - Prior Payment) | $ 449.76 | $469.66 |

157.    In this example, the Court's use of a 40 hour divisor for the salary-only pay period increased Cantrell's damages from the $181.29 calculated by Beaucourt to $449.76.  The Court's total calculation for Cantrell for April 2006 is $919.42.  This is $268.47 more than ATBI's calculation and $1263.86 less than Plaintiffs' calculation.

158.    The Court concludes that its overall damages model (1) gives effect to the intent of the parties with respect to the fixed salary, (2) takes into account that add-ons, and particularly commissions, were a significant component of Plaintiffs' compensation and were earned during all hours worked; and (3) best approximates what Plaintiffs would have earned had ATBI complied with the FLSA.  This is a unique damages model, but it was made necessary by the overall lack of

---

[31]  In any short or partial periods, the Court will use Beaucourt's method of making the necessary adjustment.  (*See, e.g.*, Beaucourt Report at Scenario 4, Category D, Calculation for Cantrell for 12/15/06 pay period.)

[32]  $600 is the result when the regular rate ($6.92) is not rounded.

consistency in ATBI's policies, actions, and compensation practices during the relevant time periods.

## VI.    Non-Testifying Plaintiffs Jones, Madden, and Phillips

159.    Courts may grant back wages under the FLSA "to non-testifying employees based upon the representative testimony of a small percentage of the employees." *Schultz v. Capital Intern. §., Inc.*, 466 F.3d 298, 310 (4th Cir. 2006); *Grochowski v. Phoenix Constr.*, 318 F.3d 80, 88 (2d Cir. 2003) ("[N]ot all employees need testify in order to prove FLSA violations or recoup back-wages."). However, "the plaintiffs must present sufficient evidence for the jury to make a reasonable inference as to the number of hours worked by the non-testifying employees." *Grochowski*, 318 F.3d at 88.

160.    Plaintiffs did not present sufficient evidence for the Court to draw any reasonable inference as to the hours worked by non-testifying Plaintiffs Jones, Madden, and Phillips. In fact, Plaintiffs presented no evidence as to the hours worked by this subset of Plaintiffs, either through deposition testimony, affidavit, or testimony of their district manager or peers. The Court's conclusions regarding hours worked were informed significantly by each individual Plaintiff's testimony and credibility, and the Court did not view any Plaintiff as offering universally "representative" testimony regarding hours worked that would apply to non-testifying Plaintiffs. Under these circumstances, Plaintiffs Jones, Madden, and Phillips are not entitled to any judgment in their favor. *See Grochowski,* 318 F.3d at 88-89 (affirming grant of motion for judgment as matter of law against four non-testifying plaintiffs where peers of such employees' offered merely speculative testimony regarding hours they worked).

## VII.    29 U.S.C. § 207(I) Exemption

161.    ATBI pled 29 U.S.C. § 207(I), commonly known as the commissioned employee exemption, as an affirmative defense. Such defense is mentioned in the Court's Pretrial Order as a pled defense but is not discussed in the issues of fact or law to be resolved at trial. This exemption provides:

> (I) Employment by retail or service establishment
> No employer shall be deemed to have violated subsection (a) of this section by employing any employee of a retail or service establishment for a workweek in excess of the applicable workweek specified therein, if (1) the regular rate of pay of such employee is in excess of one and one-half times the minimum hourly rate applicable to him under section 206 of this title, and (2) more than half his compensation for a representative period (not less than one month) represents commissions on goods or services. In determining the proportion of compensation representing commissions, all earnings resulting from the application of a bona fide commission rate shall be deemed commissions on goods or services without regard to whether the computed commissions exceed the draw or guarantee.

29 U.S.C. § 207(I).

162.    This exemption was not discussed or raised in the summary judgment briefing. This exemption was not discussed or included in the initial damages calculations completed by Beaucourt. This exemption was not discussed or raised during the *Daubert* hearing held January 4, 2011, during which Beaucourt testified and the parties made numerous arguments regarding damages. During this hearing, the Court granted ATBI's motion to reopen discovery to conduct further discovery on Plaintiffs' revised damages calculations, yet ATBI said nothing about the § 207(I) exemption or its potential impact on Beaucourt's calculations.

163.    On or around March 7, 2011, during the pretrial conference, ATBI attempted to submit an addendum to Beaucourt's Second Supplemental Expert Report, which included application of the § 207(I) exemption. This was the first time Beaucourt's damages calculations made any reference to the § 207(I) exemption and the first time Beaucourt effectively "zeroed out" Plaintiffs' damages for various months based on such exemption.

164.    On March 7, 2011, during the pretrial conference, the Court prohibited Beaucourt from supplementing her expert report with the § 207(I) addendum due to untimeliness, unfair prejudice to Plaintiffs, and the Court's unwillingness to further delay trial.[33]   ATBI had more than ample time and opportunity to develop its defense theories and its damages calculations, particularly where it was aware of § 207(i)'s existence when it filed its Answer.   ATBI's interjection of this exemption into its damages calculations three weeks before trial would have prejudiced Plaintiffs and required a delay of trial.    In addition, the Court had reviewed extensive summary judgment briefing, conducted a *Daubert* hearing, and expended judicial resources attempting to understand Beaucourt's current damages calculations, which made no mention of the § 207(i) exemption.   This exemption was simply never a meaningful part of this lawsuit until three weeks before trial.   Therefore, the undesired result of excluding a pled, potentially applicable exemption was necessary in order to avoid prejudice to Plaintiffs and any further delays in the litigation.

165.    Based on these rulings, ATBI was precluded from presenting calculations that included application of the § 207(i) exemption.   Neither party submitted proposed findings of fact or conclusions of law regarding the § 207(i) exemption.

**VIII.   Calculations**

166.    The Court orders ATBI to complete a new set of damages calculations in accordance with these Findings of Fact and Conclusions of Law, including a total due for each Plaintiff that includes liquidated damages.

---

[33]   The Court also denied ATBI's motion to designate a new expert witness, John Linkosky ("Linkosky"), for the same reasons of untimeliness and unfair prejudice.   Contrary to ATBI's argument, Plaintiffs' revisions to their calculations did not create a new need for Linkosky's proposed testimony.   Linkosky's proposed report simply offered further legal explanation for the proposed damages calculations ATBI had previously explained and presented through Beaucourt.

167.    ATBI is ordered to provide such calculations to Plaintiffs no later than January 20, 2012. The parties are ordered to meet and confer regarding any disputes over the mathematical accuracy of the calculations.  ATBI is ordered to file these calculations with the Court by February 13, 2012 and include an explanation of any unresolved mathematical disputes over such calculations.

168.    The Court understands that both parties will likely dispute and object to the Court's damages model.  However, this post-trial submission is not an opportunity to make any further damages arguments or to persuade the Court against using its elected model.  The Court expects the parties to reach an agreement as to the accuracy of the calculations made in accordance with the Court's model.

169.    To assist in such calculations, the Court offers the following summary of its factual conclusions for each Plaintiff.

| | |
|---|---|
| Ashton | 60 average weekly hours (reduced from 70 claimed) |
| Balakas | 60 average weekly hours |
| Cantrell | 60 average weekly hours |
| Carmody | 60 average weekly hours |
| Chancellor | 60 average weekly hours (reduced from 80 claimed) |
| Colvin | 57.5 average weekly hours |
| Ingram | 60 average weekly hours |
| Jones | no recovery |
| Kaiser | 62.5 average weekly hours |
| McCullough | 60 average weekly hours |
| Richardson | 60 average weekly hours |
| Shipley | 62 average weekly hours |
| Still | 60 average weekly hours |
| Thompson | 60 average weekly hours (reduced from 70 claimed) |

| Bayack | 60 average weekly hours (recovery limited to overtime due for July 1 and 15, 2008 pay periods)[34] |
| Briscoe | no recovery |
| Fritz | no recovery |
| Howard | 50.5 average weekly hours (recovery limited to overtime due for July 15, 2008 and August 1, 2008 pay periods) |
| Madden | no recovery |
| Morgan | no recovery |
| Mullen | 48 average weekly hours (recovery limited to July 1, 2008 pay period - November 14, 2008 pay period) |
| Olson | 52 average weekly hours (recovery limited to July 1, 2008 pay period - November 14, 2008 pay period) |
| Phillips | no recovery |
| Rauch | 55 average weekly hours (recovery limited to overtime due for July 1, 2008 pay period - November 15, 2008 pay period) |
| Stein | no recovery |
| Vaughn | 52 average weekly hours |
|  |  |

**IT IS SO ORDERED** this 28th day of December, 2011.

_Terence Kern_

**TERENCE KERN**
**United States District Judge**

---

[34]   Unless otherwise noted, the individual Plaintiff is entitled to recover overtime due for all claimed time periods.

61